**REPUBLIC NATIONAL LIFE INSURANCE COMPANY,**
Plaintiff-Appellee-Cross-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellant-Cross-Appellee.

No. 77–2062.

United States Court of Appeals,
Fifth Circuit.

May 7, 1979.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Gilbert E. Andrews, Act. Chief, Appellate Section, U. S. Dept. of Justice, Washington, D. C., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., M. Carr Ferguson, Asst. Atty. Gen., Gary R. Allen, Robert A. Bernstein, Atty., Dept. of Justice, Tax Div., Washington, D. C., for defendant-appellant-cross-appellee.

Larry L. Bean, H. Martin Gibson, Vester T. Hughes, Jr., W. John Glancy, Dallas, Tex., for plaintiff-appellee-cross-appellant.

Before COLEMAN, GODBOLD, and IN-GRAHAM, Circuit Judges.

PER CURIAM:

This appeal was orally argued in Dallas, March 8, 1979.

This federal income tax case involves the complex provisions of the Internal Revenue Code relating to the taxation of life insurance companies.

There were three issues before the District Court, two of which involved deferred and uncollected premiums. Subsequent to the District Court decision, the United States Supreme Court decided *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Company*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977). It is clear, and the parties agree, that resolution of the two issues involving deferred and uncollected premiums is controlled by that decision.

■■ The District Court held that Republic National Life Insurance Company (Republic) was entitled to deduct agents' commissions and state premium taxes attributable to deferred and uncollected premium income when it computed its tax on gains from operations. This holding is affirmed. The District Court held, on the other hand, that Republic was not entitled to deduct such expenses when it computed its assets for purposes of the tax levied on net investment income. This particular judgment of the District Court is vacated and the case is remanded for entry of judgment in favor of Republic, in accordance with *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Company, supra.*

There remains for our consideration the question of the proper classification of certain refunds to group insurance policyholders. We have reviewed the statutory provisions involved here, together with the relevant legislative history, and conclude that the refunds in question are properly classified as "return premiums" rather than "dividends". We believe that the memorandum opinion of the District Court is a detailed and thorough exposition of the relevant facts and applicable law and we adopt the relevant portion of the opinion of the Honorable Robert M. Hill, United States District Judge, Northern District of Texas, as the opinion of this Court. Since Judge Hill's opinion has not been officially reported, the relevant portion of the opinion is attached hereto as an Appendix.

■ In addition, we address one aspect of the classification issue not expressly dis-

cussed by the District Court. According to the government, the principal error committed by the District Court was its disregard of the expansive definition of a dividend set forth in 26 U.S.C., § 811(a). Dividends are therein defined as "dividends and similar distributions" to policyholders. The government correctly argues that Congress intended to include more than just classic dividends within § 811(a). *See, generally,* 26 U.S.C., § 316(a)–(b); 33 Am.Jur.2d, Federal Taxation (1979), ¶ 2251. Nevertheless, the record does not support the government's position that this expansive definition of a dividend was disregarded by the District Judge. To the contrary, the legislative history indicates that the § 809(c)(1) definition of what does not constitute a "return premium" is the same as the § 811(a) definition of a dividend. Judge Hill thoroughly examined the negative definition provided in § 809(c)(1).

The judgment of the District Court as to the treatment to be accorded expenses related to deferred and uncollected premiums for the purpose of computing assets is vacated and remanded for entry of judgment in accordance with *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Company, supra.* In all other respects the judgment of the District Court is affirmed.

AFFIRMED IN PART; VACATED and REMANDED IN PART.

### APPENDIX

(Excerpts of District Court opinion)

*Guaranteed Group Refunds—Dividend, Return Premium, or What?*

Republic issues nonparticipating policies of group life and group accident and sickness insurance, mostly for labor groups and their employers. For some of its larger group insurance clients, Republic offers a guaranteed group refund provision as a part of the insurance contract. In a general sense, a guaranteed refund is the insurer's promise to return a portion of the insurance premium if the insured's claims experience is better than anticipated.

Republic offers two types of guaranteed group refund policies. In the type 1 policy, Republic agrees to refund a portion of the premium if the company's claims experience is better than expected on the basis of a percentage of the premium. For example, Republic may calculate that 70% of the premium will cover claims. Republic then agrees to refund any portion of the premium that is less than the expected 70%. The policy is written for a one-year term, and the insured is not obligated to renew the policy. In some instances, Republic may also refuse to renew at the end of the policy period, and even with policies that offer the insured a guaranteed renewability provision, the insurer is free to raise the rates for the same coverage. If the policyholder renews after a year in which total claims exceed the portion of the premiums expected to cover claims, then the deficit is carried to the next year. Otherwise, Republic must pay the deficit from its retainage or other income.

The second type of guaranteed refund plan is a more complicated version of the first. The type 2 plan provides for the funding of various reserves if claims experience is favorable. Typical reserves include life insurance conversions,[10] disability waiver,[11] life benefits, major medical, and others.

During the policy period, the policy provisions can be changed only by agreement of Republic and the policyholder. During the years in question, the elements of the refund agreement were sometimes negotiated as part of the overall negotiations concerning premiums, coverage, and refund provi-

---

**10.** A person who leaves the group may convert to an individual policy, but the actuarial evidence indicates that such persons have a higher mortality than those who stay with the employer. Accordingly, the insurer accumulates reserves to account for the increased mortality.

**11.** A person who becomes totally disabled can continue his insurance coverage without payment of the premiums. The reserve is intended to cover that contingency.

sions.[12] From 1958 through 1967 and thereafter, Republic increasingly favored the more complicated type 2 contracts because of increased costs associated with the type 1 plan and the additional protection that the reserves afforded the insurer. If a type 2 policyholder canceled, it was entitled to receive all "vested" reserves. A reserve was vested to the extent not actually needed to provide policy benefits except in those instances in which Republic required a minimum reserve figure (usually in the life and medical reserves) before the reserve became "vested." The group refund payments accrued and became payable to individual companies regardless of Republic's overall profit picture or the success (or failure) of the group business as a whole. The group refunds could be manually calculated from the formula fixed in the contract, and the payment of the refund was not subject to the board of directors' discretion after the contract was executed.

The issue to be determined is whether the refunds Republic made to group policyholders pursuant to its guaranteed refund policies [13] are "return premiums," or "dividends to policyholders," or something else. This classification problem affects the deductibility of the refunds from Republic's calculation of its gross income and the phase II tax on gains from operations.

To determine gain or loss from operations in phase II of the tax, section 809 requires the insurer to total all premium income as part of its gross income. Section 809(c) specifies that the premiums that must be taken into account are gross premiums less, among other items, return premiums. Return premiums are then defined in section 809(c)(1) of the Act.[14]

In subsection (d) of section 809, Congress provided twelve specific deductions from gross income as calculated earlier in section 809. Included is a deduction for "dividends to policyholders," (section 809(d)(3)) a term which is defined in section 811.[15] Congress recognized that the deduction for dividends to policyholders would benefit the mutual companies who wrote participating policies. In fact, one of Congress's principal areas of concern when it enacted the 1959 Act was the relative tax burdens of the mutual and stock companies.[16] Congress further recognized that the tax treatment of dividends would in large measure determine the tax distribution between mutual and stock companies. Integral to the balance Congress struck between the two kinds of insurance companies was its decision to allow divi-

**12.** As an example of how Republic could exact concessions on the refund agreement in such negotiations, the Government introduced Exhibit 58. In a letter from a Republic employee to one of its agents it was stated:

"Enclosed is a new retention illustration. Please have the policyholder sign this and return a copy to me for my file. Ron, this new retention illustration is a condition of renewal. We are not asking a rate increase at this time. However, their present retention illustration as a reserve of 12½%. Obviously this is much too low. Therefore, we would like to have this signed and returned so that we can set up adequate reserves on this case."

**13.** During the years 1958 through 1967, Republic accrued group refunds in the following amounts:

| 1958 | $321,676.07 |
| 1959 | $177,405.35 |
| 1960 | $407,094.99 |
| 1961 | $505,824.86 |
| 1962 | $264,801.48 |
| 1963 | $743,873.89 |
| 1964 | $698,070.24 |
| 1965 | $565,349.06 |
| 1966 | $2,866,653.75 |
| 1967 | $5,616,897.02 |

**14.** "*Premiums.*—The gross amount of premiums and other consideration . . . on insurance and annuity contracts . . . ; less return premiums . . . . Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums."

**15.** Section 811 provides, "For purposes of this part, the term 'dividends to policyholders' means dividends and similar distributions to policyholders in their capacity as such."

**16.** See page 5 of the report of the House Committee of Ways and Means, H.R. 4525. Report No. 34, 86th Cong., 1st Sess.

dends to policyholders to be deducted in phase II of the tax. In the floor debates, Representative Mills was careful to explain that the dividend provisions favorable to the mutuals were limited and offset by concessions to the stock companies.[17] The section 809(c)(1) deduction for return premiums is not subject to the limitations that affect policyholder dividends.

It is evident that the proper classification of the group refunds in question here is important to the tax balance between mutual and stock companies, a balance Congress carefully considered in enacting the 1959 Act. Industry experts have disagreed about the proper classification of the guaranteed refunds. The official Government position is that the refunds paid to policyholders pursuant to such refund agreements are dividends or similar distributions to policyholders and not return premiums. Revenue Ruling 67–180, 1967–1 Cum.Bull. 192.

■ Analysis of the classification issue begins with a consideration of the statutory definition in section 809(c)(1). It must first be noted that the definition is a negative one, related in an obvious manner to distinguishing return premiums from dividends. The statute states that a return premium cannot be an amount that (a) is not fixed in the contract [another confusing double negative one often finds in the tax code], (b) depends on the experience of the company, or (c) depends on discretion of management.[18]

The Government has admitted that the refund payments in question are fixed in the contract and are not subject to the discretion of the board of directors or management. The controversy thus centers on the question of whether the refunds depend upon "the experience of the company." The Court is of the opinion that the reference to "the company" must mean the life insurance company, not the insured or policyholder. The statute generally refers to the taxpayer as the life insurance company, § 801(a). And there are other references in the Act in which the taxpayer is referred to simply as the company. §§ 805(b)(4), 809(c)(1). In each of these instances, the context makes clear that the company means the taxpayer company, similarly, the more natural reading of § 809(c)(1) indicates that Congress was speaking of the experience of the taxpayer company because, as noted above, the definition is written in terms of dividends. The fact that the reference to the company's experience is immediately followed by the requirement that the refunds not depend upon the "discretion of the management" indicates that the company is the insurer.

■ The Government argues that "experience of the company" means any experience of the company. The taxpayer urges that this phrase refers only to the profit and loss experience of the company. The issue is one of those in which it is possible to become mired in a semantic debate that leads nowhere because it is, of course, true that the taxpayer's cumulative experience with all its clients amounts to the taxpayer's experience, and one is hard-pressed to know where to draw a line that distinguishes one "experience" from another.

---

17. Cong.Rec.–House, Vol. 105, No. 21, 86th Cong., 2d Sess. (Feb. 18, 1958), pg. 2567. Mills was discussing the House version of the bill, with reference to provisions that were substantially changed in the final version. However, section 809(d)(5) was enacted, and it allowed a deduction from income equal to ten percent of the increase in reserves for nonparticipating policies. This section was designed to aid stock companies; however, the section does not aid the taxpayer in this case because the deduction does not apply to group policies. In addition, section 809(f)(1) limits the total deductibility of certain items, including dividends to policyholders, to $250,000 plus the amount by which gain from operations exceeds taxable investment income. As a result, taxable investment income (phase I) cannot be reduced by more than $250,000 if the deduction arises from dividends to policyholders.

18. The Treasury Department has promulgated regulations, further defining "return premiums" as ". . . amounts returned or credited which are fixed by contract and do not depend upon the experience of the company or the discretion of management. Thus, such term includes amounts refunded due to policy cancellations or erroneously computed premiums . . . .."

But the most significant fact in the case of these group policyholders is that the insurer's liability for the group refund arises without regard to the experience of other clients or the overall profit and loss experience of the company itself.[19] Section 809(c)(1) represents an attempt to distinguish return premiums from dividends and the definition was written in terms of classic dividend characteristics. In this context, the taxpayer's argument that Congress intended experience to mean profit and loss experience of the company is a natural and persuasive reading of the statute.

The Government also argues that the group refund policies reflect the experience of the company because Republic uses industry standards and actuarial assumptions to determine the premiums to be charged, the amounts of the various reserves, and other provisions. Republic's reply to this argument is that the Government's position goes too far. If carried to its logical consequences, the Government's argument would reduce the return premiums deduction to a nullity because all policies involve the use of actuarial and morbidity tables which are, of course, based upon industry experience. It is impossible to conceive of the existence of an insurance contract that does not use certain experience factors. In the Court's judgment, it cannot be said that the reference in section 809(c)(1) to the experience of the company includes the kinds of experience that go into setting the premium price or reserve limitations of the guaranteed refund policies in question.

Having concluded that the refunds in question are fixed in the contract and do not depend on the experience of the company or the discretion of management, the Court still must determine if the items in question are return premiums. The analysis thus far leads one to the conclusion that the refund payments are not prevented from being return premiums by the definition in section 809(c)(1) which states only what a return premium is not. There is, unfortunately, very little indication in the statute or legislative history of what Congress intended when it allowed a deduction for return premiums. The Senate Finance Committee Report states,

> "In excluding return premiums, amounts returned (by whatever name called) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of management are not to be treated as return premiums, except in the case of return premiums or other consideration returned to another life insurance company under an indemnity reinsurance contract. Furthermore, amounts rebated or rendered due to policy cancellations or to erroneously computed premiums are to be treated as return premiums."

Senate Finance Committee Report No. 291, 86th Cong., 1st Sess., at 54. The regulations put a slightly different meaning to return premiums.

> "The term 'return premiums' means amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of management. Thus, such term includes amounts refunded due to policy cancellations or erroneously computed premiums."

Treas.Reg. § 1.809–4(a)(1)(ii). Again, the Senate report and the regulations merely track the statutory definition of the return premium, which amounts to no definition at all.

The Government introduced evidence that return premiums are premiums returned when no risk to the company are attached.[20] The common examples of re-

---

**19.** There is no pooling of risk with such policies, a condition known in the industry as 100% credibility.

**20.** Republic has moved to strike this testimony on the grounds that the Government failed to mention it in response to proper discovery directed at producing this information. In light

of the Court's conclusion on the merits, the motion may be moot. To clarify the record, however, the Court has considered the testimony on this issue and hereby overrules Republic's motion on the grounds that the Government's response to Republic's discovery request was adequate.

turn premiums—erroneously computed premiums, suicides, fraudulent statements, and cancellations—accord with the Government witnesses' economic arguments. The difficulty is that there is no statutory basis, either in the language or in the legislative history, for this conclusion. The Court is of the opinion that Congress did not intend to limit return premiums to those items listed. Rather, the statute and legislative debate indicate an intention to leave the issue open.

One may gather another strand of a definition from the limited legislative history. Congress characterized a return premium as a return of the premium as distinguished from a payment derived from any other income source. For example, the Congressional debates indicate that a return premium cannot be paid from investment income.[21] In fact, the debates reflect an understanding that "dividend" as used in the insurance industry is a term of art which means almost any payment not derived solely from premium income. The refunds paid to the policyholders pursuant to the contracts at issue satisfy the "solely from premiums" limitation because liability for the refund is not related to the company's investment experience.

It appears to the Court that the refunds actually paid to the policyholders pursuant to the policies in controversy are return premiums and are therefore entitled to an unrestricted deduction. § 809(c)(1). The Court does not believe that characterizing the refunds actually paid as returned premiums leads to any tax advantage for stock companies because the mutuals are presumably free to write similar coverage and obtain similar tax treatments. Moreover, this result is in accordance with the congressional belief expressed in the 1959 debates that in general the stock companies were able to charge lower premiums for the same coverage.

21. Congress intended that a return premium should be treated as a reduction in premium for which the company owed no tax. As Representative Mills stated in his explanation of HR 4245 to the entire House of Representatives:

"The bill has the effect of recognizing two elements in the policy dividends. A part of the dividend is a distribution of profits earned from dealing with third parties. Part of it is a return to the policyholder of an excess premium that the same policyholder was required to contribute when he joined the mutual organization. The bill operates so that a distribution of policy dividends cannot reduce the tax on free investment income provided by phase I. The bill does provide that the policyholder dividends can be deducted against any extra underwriting income in phase II but they cannot generate an underwriting loss that would reduce the taxable investment income under phase I. In effect, if the dividend is out of the free investment income, then there is no deduction; if it is a return of extra premium—that is, if it is out of the premium income itself—then there is a deduction." Cong.Rec.–House, Vol. 105, No. 27, 86th Cong., 2d Sess. (Feb. 18, 1959) at 2334, et seq.