AMERICAN NATIONAL INSURANCE COMPANY

v.

The UNITED STATES.

Nos. 336–73, 193–78.

United States Court of Claims.

Sept. 22, 1982.

Vester T. Hughes, Jr., Dallas, Tex., attorney of record, for plaintiff. W. John Glancy, Dallas, Tex., David F. P. O'Connor, David L. Sinak, and Hughes & Hill, Dallas, Tex., of counsel.

Michael J. Dennis and Robert C. Markham, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL DISMISSAL AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The principal issue in this case, and the only one we discuss on the merits, is whether "experience rating refunds" that the plaintiff life insurance company was contractually obligated to pay to certain of its policyholders constituted "return premiums" or "dividends to policyholders" under the Life Insurance Company Income Tax Act of 1959, Pub.L.No.86–69, 73 Stat. 112 (codified as amended at 26 U.S.C. §§ 801–20 (1976 & Supp. IV 1980) [hereinafter referred to as the "Code" and cited as I.R.C.] ) (the "Life Insurance Tax Act").

The significance of this distinction is that in determining a life insurance company's taxable income, the Life Insurance Tax Act limits the amount of "dividends to policyholders" but not the amount of "return premiums" that a life insurance company may deduct from its gross income. The plaintiff naturally contends that the refunds are "return premiums," and the government contends that they are "dividends to policyholders." The plaintiff has moved for summary judgment on this issue. The defendant opposes the motion on the ground that there are disputed factual issues for which a trial is required.

We hold that the experience rating refunds are return premiums, and we therefore grant the plaintiff's motion for summary judgment on this issue.

I.

The plaintiff, American National Insurance Company ("American National"), is a stock insurance company, the shares of

which are publicly held.[1] For the years involved in this case (1958 through 1969), American National offered group credit life and group credit disability insurance. The insurance policies were issued through creditor organizations (such as banks) to insure loans they made against the death or disability of the debtors. American National dealt only with the credit organizations, which will be referred to as the "policyholders." The policyholder typically insured only those loans for which the debtor paid the premium.

These group policies were "Non-Participating," i.e., the policyholders were not entitled to share in American National's divisible surplus.

For many of the group policies, American National entered into experience rating refund agreements with the policyholders. The refund agreement provided a mechanism by which part of the excess premium collected for the group—the portion of the premium not required to meet the claims of the group or American National's expenses and profit connected with the group— would be returned to the policyholder.

The experience rating refund agreements provided a formula for calculating the excess premium for a given period (usually the policy year) and stated the percentage of the excess that American National was obligated to refund. The excess equalled the difference between (1) the total earned premium for the particular group policyholder during the relevant period and (2) the sum of (a) the premium loading (i.e., that part of the premium retained by the plaintiff to cover expenses and profits), (b) the claims made by the policy group during the relevant period (including claims actually paid, claims reported but not yet paid and a reserve to cover claims incurred but

not yet reported ("unreported claims")), and (c) specified extraordinary claims expenses. Each agreement also specified a percentage—or schedule of percentages which generally rose with the level of premiums—of this excess to which the policyholder was entitled.

If there was no excess premium but was a deficit, American National carried the deficit over to the next year if the policy was renewed. (It is unclear whether the deficit increased the policyholder's premium for the next year or whether it merely reduced the next year's experience rating refund.) If, however, the policy was not renewed, American National absorbed the deficit.

In its federal income tax returns for the years involved, American National treated the experience rating refunds as return premiums and deducted their full amount from its gross income. The Commissioner of Internal Revenue, however, ruled that the refunds were dividends to policyholders and therefore disallowed the deduction of the portion of those payments that exceeded the maximum permissible deduction for policyholder dividends. The plaintiff paid the additional tax assessed, filed a timely claim for refund and, after the Commissioner denied the claim, filed the present suit. The petition contains 10 different claims, only three of which are involved in the present proceeding.

## II.

A. From 1921 until the Life Insurance Tax Act, life insurance companies were taxed only on their excess or "free" investment income (i.e., the insurance company's earnings from investment above those allocated to policyholders under statutory provisions) but not on their underwriting in-

---

1. In the life insurance industry, there are basically two types of firms—stock companies and mutual companies. Stock companies distribute gains on underwriting and investment (in excess of policy claims and expenses) to their stockholders, who are distinct from their policyholders. Mutual companies, on the other hand, have no stockholders but are owned, in effect, by the policyholders. The mutuals issue

"participating policies," which entitle the policyholders to share in the life insurance company's divisible surplus. The surplus, consisting of gains from both investments and underwriting, usually is distributed to the policyholders in the form of dividends or rate credits (reductions in the premium rate)—both are referred to here as policyholder dividends.

come (i.e., earnings on premiums in excess of claims and expenses related to the policies in a given year). *See generally Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148, 152–54, 97 S.Ct. 2523, 2526–2527, 53 L.Ed.2d 653 (1977); *Alinco Life Insurance Co. v. United States,* 178 Ct.Cl. 813, 373 F.2d 336 (1967); 8 J. MERTENS, THE LAW OF FEDERAL INCOME TAXATION § 44A.01 (1978) [hereinafter cited as MERTENS' LAW OF INCOME TAXATION].

In the Life Insurance Tax Act, Congress subjected to taxation all the income of life insurance companies. It did so by dividing total income into three phases and taxing those phases under complicated formulae. *See generally* I.R.C. § 802(b); H.R.REP.No. 34, 86th Cong., 1st Sess. 1–17 (1959); S.REP.No.291, 86th Cong., 1st Sess. 13–29 (1959), U.S.Code Cong. & Admin.News 1959, p. 1575; 8 MERTENS' LAW OF INCOME TAXATION, *supra,* at § 44A.01.

Phase I consists of the company's free investment income (as calculated under sections 804 through 806 of the Code), or its total income from all operations (as calculated under sections 809 through 812 of the Code) if less than free investment income. I.R.C. § 802(b)(1). (If income from operations is less than free investment income, the company pays tax only under phase I, and phases II and III are inapplicable.) Phase II consists of one-half of the difference between income from operations (if larger than free investment income) and free investment income. *Id.* at § 802(b)(2). The difference between the gain from operations and free investment income was thought by Congress to be roughly equivalent to underwriting gain. *See, e.g.,* H.R. REP.No.34, *supra,* at 3, 13; S.REP.No.291, *supra,* at 6. Phase II thus taxes one-half of the taxpayer's underwriting income. The remainder of underwriting income is taxed under phase III when it is distributed to stockholders. I.R.C. § 802(b)(3). (Phase III is not relevant to our decision and will not be discussed further.)

B. Gain or loss from total operations is calculated under sections 809 through 812 of the Code. Gross gain is the sum of three income items: the insurance company's share of all investment income, its gross receipts from its insurance business (i.e., premiums, decreases in reserves and miscellaneous items) and, after 1961, its net capital gain. I.R.C. §§ 809(b) & (c); *see* 8 MERTENS' LAW OF INCOME TAXATION, *supra,* at § 44A.09. Section 809(d) lists a number of deductions, including dividends to policyholders, that reduce this gross amount. *See also* 8 MERTENS' LAW OF INCOME TAXATION, *supra,* at § 44A.10.

The major component of gross receipts, which itself is one of the three items of gross gain from operations, is premiums on insurance and annuity contracts. Section 809(c)(1) of the Code defines the premiums that must be included in gross receipts as gross premiums less, *inter alia,* "return premiums." There are no explicit limitations on the amount by which return premiums may reduce gross premiums.

"Dividends to policyholders," on the other hand, are deducted from gross operations income under section 809(d)(3). The policyholder dividend deduction consists of the dividends paid (or rate credits made) and changes in the size of any reserves held by the taxpayer for dividends payable. I.R.C. § 811(b).

Section 809(f) of the Code, however, limits the deduction of policyholder dividends. The amount of policyholder dividends that may be deducted from gross operations income cannot exceed the amount by which gross operations income, unreduced by dividends to policyholders (or the deductions under sections 809(d)(5) and (6)), exceeds free investment income, plus $250,000. In other words, while dividends to policyholders may be deducted in full against phase II or underwriting income, they may reduce phase I or free investment income by not more than $250,000.

Insofar as this case is concerned, the only difference between characterizing an amount returned to a policyholder as a return premium or as a dividend is the extent to which the amount may reduce free investment (phase I) income. Regardless of the characterization, amounts returned to

policyholders may reduce a taxpayer's phase II, or underwriting, income without limitation. Only return premiums, however, may be deducted in full and without limitation against phase I income.

### III.

A. The amounts returned by life insurance companies to their policyholders are either "return premiums" under section 809(c)(1) of the Code or "dividends to policyholders" under section 811. *See Republic National Life Insurance Co. v. United States,* 594 F.2d 530, 532 (5th Cir. 1979); Treas. Reg. §§ 1.809–4(a)(1)(ii), 1.811–2(a) (1982); 105 CONG.REC. 2574–75 (1959) (statement of Representative Wilbur Mills indicating that "amounts returned" to policyholders are either one or the other).

The definition of "return premiums" in section 809(c)(1) of the Code is a negative one. It states that the term does not include "amounts returned [to policyholders] where the amount is not fixed in the contract but depends on the experience of the company or the discretion of management." The pertinent Treasury Regulation, section 1.809–4(a)(1)(ii) (1982), similarly defines return premiums as "amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of management." Section 811(a) of the Code defines "dividends to policyholders" as "dividends and similar distributions to policyholders in their capacity as such." The regulations, however, state that policyholder dividends include "amounts returned to policyholders where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management." Treas.Reg. § 1.811–2(a) (1982).

Neither the statute nor the regulations define the terms "fixed in the contract," "the experience of the company," and "the discretion of management." These terms are ambiguous and the parties dispute both their meaning and their application. *See infra* pp. 885–887.

█ The legislative history of the Life Insurance Tax Act, although not directly focusing on the meaning of those terms, reflects a congressional design and purpose in limiting dividends to policyholders in the phase I calculation that illuminates the reason Congress excluded from return premiums (which are fully deductible under phase I) amounts that are "not fixed in the contract but [that] depend[ ] on the experience of the company or the discretion of management." The legislative history shows that Congress intended to treat as dividends to policyholders only those amounts that could be used to distribute part of the company's surplus and not amounts that constituted only a return of part of the premium.

The legislative history indicates that Congress distinguished between the deductibility of policyholder dividends and of return premiums because it believed that unlimited deductibility against phase I income of policyholder dividends would enable mutual insurance companies to avoid taxation on investment income and thereby to obtain a competitive advantage over stock companies. *See, e.g.,* 105 CONG.REC. 2566–69, 2573–74, 8428, 10412 (1959); H.R.REP.No.34, *supra,* at 6–7; S.REP.No.291, *supra,* at 10–11, 22; HOUSE SUBCOMMITTEE ON INTERNAL REVENUE TAXATION, COMMITTEE ON WAYS AND MEANS, REPORT ON THE TAXATION OF LIFE INSURANCE COMPANIES, 85th Cong., 2d Sess. 7 (1958) [hereinafter cited as SUBCOMMITTEE REPORT]; *Hearings before the Senate Finance Committee on H.R. 4245,* 86th Cong., 1st Sess. 21–22 (1959) [hereinafter cited as *Senate Hearings* ] (statement of David Lindsay, Assistant Secretary of the Treasury, the department that drafted the basic bill). Congress did not perceive the same inherent danger in allowing other amounts returned to policyholders to be deducted without limitation against phase I income. *See, e.g.,* 105 CONG.REC. 2573–74 (1959) (see below). There is no indication that Congress understood, or intended to create, any other relevant distinction between the two deductions.

Much of the testimony and debate on the Life Insurance Tax Act concerned whether any part of policyholder dividends should be taxed. *See, e.g.,* 105 CONG.REC. 2567–68

(1959) (Representative Mills). On the one hand, there was nearly unanimous agreement that the return of "redundant" (also called "excess," "overcharge," etc.) premiums was a return of capital to the policyholder that should not be taxed. *E.g.,* 105 CONG.REC. 2567–68, 2569–70, 2573–74, 8401, 8428 (1959); H.R.REP.No.34, *supra,* at 13–14; SUBCOMMITTEE REPORT, *supra,* at 6; *Hearings before the House Subcommittee on Internal Revenue Taxation of the Committee on Ways and Means,* 85th Cong., 2d Sess. 52 (1958) [hereinafter cited as *House Hearings*]; *Senate Hearings, supra,* at 32, 225, 637, 645.

On the other hand, despite the opposition of the mutual insurance companies, Congress viewed the portion of policyholder dividends derived from investment earnings as income properly taxable to the insurance company. *E.g.,* 105 CONG.REC. 2567–70, 2573–74, 8401, 8428 (1959); H.R.REP.No.34, *supra,* at 7; S.REP.No.291, *supra,* at 22; SUBCOMMITTEE REPORT, *supra,* at 7; *House Hearings, supra,* at 26, 53; *Senate Hearings, supra,* at 32, 53, 225, 637.

The Life Insurance Tax Act was designed to allow insurance companies to return redundant premiums (i.e., phase II or underwriting income) without incurring a tax on those amounts. Congress, however, also adopted provisions designed to prevent life insurance companies from avoiding taxation under phase I by distributing investment income to policyholders. Congress did so in two ways.

First, Congress concluded that by allowing dividends to be deducted without limitation from phase II income while limiting their deductibility from phase I income, the companies would be able to return redundant premiums but not to distribute untaxed investment income. *E.g.,* 105 CONG. REC. 2568 (1959) (statement of Representative Mills) ("if the dividend is out of the free investment income, then there is no

deduction; if it is a return of extra premiums—that is, if it is out of premium income itself—then there is a deduction"[2]); *see also id.* at 2574 (Representative Mills), 8428 (Senator Curtis); H.R.REP.No.34, *supra,* at 6–7; *Senate Hearings, supra,* at 22 (statement of Assistant Secretary Lindsay); *id.* at 645 (statement of Professor Roy E. Moor in support of the bill) ("the bill in its present form assumes that dividends are price rebates up to the entire amount of net premium income, that is, all profits stemming from premiums can be distributed back to policyholders taxfree").

Second, Congress decided that life insurance companies should be permitted to deduct from both phases I and II without limitation premium refunds or rebates to policyholders that are inherently incapable of being used to distribute investment income, and treated those amounts as return premiums.

In response to a question from a colleague during the debate on the House version of the Life Insurance Act, Representative Wilbur Mills, the chairman of the House Ways and Means Committee, out of which the bill had been reported, explained the reason for allowing unrestricted deduction of return premiums:

> What we are trying to do in this for the purpose of step [i.e., phase] 2 is to permit an absolute deduction for refunds to policyholders if there is a contract with the policyholder to refund some definite amount; but if amounts are refunded that are not fixed in the contract these will not be included as return premiums. These contingent amounts will not be treated as an absolute deduction but they will be treated as dividends to policyholders. They can only be deducted against the excess of total income over taxable investment income.

2. In the House version of the Life Insurance Tax Act, policyholder dividends could be deducted in full from phase II income but not from phase I at all. *See* H.R.REP.No.34, *supra,* at 12, 31-32, 72. The Senate amended the House version to provide for a deduction from

phase I income of up to $250,000. *See* S.REP.No.291, *supra,* at 22, 56, 107. The Conference adopted the Senate amendment. H.CONF.REP.No.520, 86th Cong., 1st Sess. 17 (1959).

[I]f we do not have this language in the bill and the other language having to do with dividends not decreasing of the tax in phase 1, I would suggest ... that the big mutuals in a short period of time would relieve themselves of the payment of any tax under this program....

\* \* \* \* \* \*

In the bill we are saying that you will not be able to return a part of the investment held free of tax. We are saying, however, that you can return out of any net operation gain any excess loading in connection with the fixing of the premium or in what might otherwise be known as underwriting gains. That can be done by a stock company; that can be done, of course, by mutual companies. But we would not ... permit a company to avoid the payment of a tax on its investment yield simply because the company had said in a contract with a policyholder that it ... intended to refund to the policyholder some of that investment yield.

105 CONG.REC. 2573–74 (1959).

In other words, the critical distinction between policyholder dividends and return premiums is their relative ability to serve as a mechanism for distributing a life insurance company's free investment income. A return of solely excess premium is a return premium unless it may be used to distribute investment earnings.

■ This legislative history explains the basic concept that the definition of return premiums embodies and indicates the path to be followed in interpreting and applying these provisions. The act excludes from return premiums amounts over which the life insurance company has control at the time they are returned (those not "fixed in the contract" or dependent on the "discretion of management") or amounts which are based upon the overall profit and loss experience of the company (amounts dependent on the "experience of the company").

B. The government, however, argues that Congress intended to define return premiums much more narrowly and policyholder dividends much more broadly. It urges that Congress intended to incorporate the definition of the two terms as understood in the insurance industry.

According to the affidavits of its insurance experts, the government would limit the term "return premiums" to "fractions of (or entire) gross premiums that have not been earned and are being refunded to the policyholder because of termination of the policy prior to the expiration of the full term of coverage for which the policyholder has paid the gross premium." This limitation, however, ignores the considerations that led Congress to distinguish between return premiums and dividends (see *supra* at pp. 882–884). Moreover, the legislative history indicates that the congressional reference to refunds for policy cancellations and similar reasons was merely illustrative, not exclusive.[3]

After the House of Representatives passed its version of the Life Insurance Tax Act with language identical to that defining return premiums in section 809(c)(1) of the version enacted, the Senate Finance Committee held hearings on the bill. During those hearings, the committee received a letter from the Life Insurance Association

---

**3.** Revenue Ruling 67–180 (1967–1 C.B. 172, 173) states that return premiums are "limited to situations where the premium has been erroneously calculated, where the policy has been canceled before the end of the contract period, or has been procured through fraud, or issued through mistake of law or fact or is void." The government has not cited this ruling or Revenue Ruling 77–39 (1977–1 C.B. 191, 192), which reiterates this definition. Its argument here is indistinguishable from the discussion in the two rulings.

The ruling defines dividends to policyholders as "allocation[s] of divisible surplus payable to policyholders" and return premiums more generally as "adjustment[s] for premiums to which no risk has attached." Rev.Rul. 67–180, 1967–1 C.B. 172, 173. (The ruling does not explicitly categorize payments, such as experience rating refunds, to which risk has attached but that are not payable out of divisible surplus.) The ruling cites no support in the statute or legislative history for its conclusion that the significant distinction is the attachment of risk, and we have found none.

of America suggesting several technical amendments of the House bill. *Senate Hearings, supra,* at 524–29. The letter requested that the Senate "make it clear that return premiums includes premium refunds made on cancellation of policies or change to lower premium plans." *Id.* at 526. According to the letter, those refunds "are contractual" but not always "spelled out in the policy." *Id.* "For that reason it could be suggested that they are paid in 'the discretion of the management.' At the same time, it is clear that they should be treated as return premiums, and not as policyholder dividends. This ambiguity should be corrected either in the bill or in the report on the bill." *Id.*

Although the Senate did not change the language of the bill, the committee report after essentially restating the statutory description of what is and what is not a return premium, said: "Furthermore, amounts rebated or rendered due to policy cancellations or to erroneously computed premiums are to be treated as return premiums." S.REP.No.291, *supra,* at 54, U.S.Code Cong. & Admin.News p. 1629. Apparently tracking the clarification in the report, section 1.809–4(a)(1)(ii) of the regulations, which defines return premiums, states that the term "includes amounts refunded due to policy cancellations or erroneously computed premiums."

This history does not support the government's contention that return premiums are limited to policy cancellation refunds. Indeed, without the clarification in the Senate Report, it would be questionable whether return premiums even included such refunds. Furthermore, if Congress had intended to limit return premiums to such refunds, one would have expected Congress to express clearly its intent to do so once the ambiguity was pointed out. Instead, the Senate merely determined that cancellation refunds, which are not used to distribute investment earnings, should be included in the larger category of return premiums.

## IV.

A. Under these standards American National's experience rating refunds were return premiums.

1. *The Amount of the Refunds Was Fixed by the Contract.* The level of experience rating refunds is established by a detailed formula contained in written agreements. Although American National has discretion whether or not to enter into such an agreement, once the agreement is executed the company has no control over whether and to what extent to pay the refunds.

The government argues that at least that part of the formula relating to the calculation of a reserve for unreported claims is not specified in the contract. The fact that every detail of the formula was not specified in the contract, however, does not mean that the amount of the refund was not fixed in the contract. Policy-cancellation refunds concededly are return premiums, even though the contract may not always explicitly so provide in detail.

In this case, although the policy was silent about the method of calculating the reserve for unreported claims, in a deposition conducted by the government, William Nicol, American National's executive vice-president, indicated that the reserve is calculated according to well established industry standards. The government does not dispute this. Nor has the government after extensive discovery cited any situation in which the plaintiff has manipulated the reserve calculation to vary the level of refunds.

Pointing to only five specific instances, the government also argues that the plaintiff retroactively changed the percentage of the excess premiums to which some policyholders were entitled under experience rating refund agreements. These few isolated instances are *de minimis.* After months of examining the plaintiff's records, the government has turned up only five documents indicating retroactive changes in refund agreements with policyholders. All five changes, according to the affidavit of Mr. Nicol, were due to administrative er-

rors. The documents are consistent with this explanation, and the government has not refuted it. Furthermore, the government does not suggest that the retroactive changes were used to distribute untaxed investment income. Five isolated retroactive changes in retention rates do not establish that the amounts of the refunds were not fixed contractually.

2. *The Amount of the Refunds Does Not Depend Upon Experience of the Company or the Discretion of the Management.* The two other facets of the definition of return premiums—that the amounts not depend upon the experience of the company or the discretion of management—may not have independent significance. They seem to be opposite sides of the same coin, in the sense that the inquiry is whether the amounts either are fixed by the contract or depend upon the experience of the company or the discretion of management. Since we hold that the amounts of American National's experience rating refunds were fixed by the contract, it follows that they did not depend upon the experience of the company or the discretion of management. Because the government makes arguments directed to the latter two factors, however, we discuss them separately.

a. *Experience of the Company.* The experience rating refunds do not depend on the profit and loss experience of the company. The plaintiff is obligated to pay the refunds on the basis of the claims and expense experience of the particular policyholder regardless of the plaintiff's overall profit and loss experience—it must pay the refund even when its investments lose money. *See Republic National Life Insurance Co. v. United States,* 594 F.2d 530, 535 (5th Cir. 1979).

The government does not argue that the experience rating refunds depend on the overall earnings experience of American National. It contends, however, that because the amount of the refunds depends on the claims experience of a particular policyholder, the refunds cannot qualify as return premiums.

It is the profit and loss experience "at the level of the life insurance company," however, and not at the level of the individual policyholder, that is relevant. SUBCOMMITTEE REPORT, *supra,* at 7; *see also* 105 CONG. REC. 8428 (statement of Senator Curtis). If the amount returned depends on the profit or loss of the company (even if that amount does not depend on management discretion), it comes out of divisible surplus, can be used to distribute investment earnings and so is to be treated as a policyholder dividend. *See Republic National Life Insurance Co.,* 594 F.2d at 534–35;[4] 105 CONG. REC. 2573–74 (1959) (Representative Mills). If, however, the amount returned depends only on the claims and expense experience of the insured, the amount returned represents only underwriting profits, and there is no danger that investment income will be distributed to policyholders.

The government also points out that the formulas used to calculate experience rating refunds are derived from American National's experience with similar policyholders. That fact does not convert the refunds into dividends. The experience of the company to which the Life Insurance Tax Act refers is its experience in the particular year for which the refunds are made, not its overall past experience and history. The government's broad definition of experience would make it impossible for any refunds to qualify as return premiums. *See Republic National Life Insurance Co.,* 594 F.2d at

4. In *Republic National Life,* the Fifth Circuit determined that premium refunds similar to experience rating refunds were return premiums. The sole question was whether those refunds depended on the "experience of the company." The court noted that section 809(c)(1) "represents an attempt to distinguish return premiums from dividends and the definition was written in terms of classic dividend characteristics." 594 F.2d at 535. The court concluded that "a natural and persuasive reading of the statute" indicates "Congress intended experience to mean profit and loss experience of the company." *Id.* Since the refunds there depended only on the experience of the insured and not on "the experience of other clients or the overall profit and loss experience of the company itself," the court concluded the refunds were return premiums. *Id.*

535. The essence of insurance is the prediction of the future based on past experience, and so premiums and refunds necessarily will reflect an insurance company's past experience. *Id.* The fact that the formula for the experience rating refunds reflects past claims experience does not show that American National uses or may use its experience rating refunds as a means of distributing investment income.

b. *Discretion of Management.* The government argues that American National's frequent payment of advance refunds (i.e., advances against the actual refunds that subsequently would be calculated at the end of the policy year) indicates that the experience rating refunds depended on the discretion of management. Again, however, the government has not alleged that this practice resulted in the distribution of investment earnings. Furthermore, the government does not allege that the practice resulted in American National's having paid during the policy year a total refund different from the amount the policyholder would have received under the contract if the entire refund were paid at the end of the year. Since the advance refunds had no effect on the total amount of refunds paid, the "amount returned ... [did not] depend on the discretion of management." I.R.C. § 809(c)(1).

The government urges, however, that at a trial it will show that the management used its discretion in designing the refund formulas in its policies. Here, as in the case of the government's similar argument under the experience of the company factor just discussed, the argument proves too much. If section 809(c)(1) requires the absence of any discretion on the part of management, it is difficult to see how any refund could ever qualify as a return premium. For example, in setting the method of calculating refunds due to policy cancellations and the like (which the government acknowledges are return premiums, *see, supra* at p. 884), the government's experts state that the insurance industry has two different methods for making that calculation. Since the choice between the two methods necessarily involves an exercise of discretion, under the government's theory those refunds could not be return premiums.

The important point is that in choosing the refund formula, American National cannot manipulate the amount of the refund to distribute investment earnings. At the time the company adopts the refund formula, it cannot know the future level of divisible surplus or the subsequent claims experience of the insured. Without knowing those facts, American National cannot exercise its discretion in setting the formula so as to reduce the tax on its investment income.

B. Most policyholders paid their premiums to American National monthly. According to the government, American National allowed some policyholders to pay their premiums less frequently, up to every six months. In return, the refund formula was adjusted so that those policyholders received a smaller percentage of the excess premiums than comparable policyholders who were not allowed to accumulate their premiums.

The government points out that the favored policyholders were able to earn interest on the withheld premiums during the additional period they deferred payment and that American National lost the interest on this money it could have earned if the premiums had been paid monthly. The government argues that the effect of this practice was to distribute investment income of American National to its policyholders, i.e., the interest it would have earned if the premiums had been paid monthly.

American National did not itself earn anything on the premiums it allowed its policyholders to retain. It was the policyholders, not the insurance company, that had the earnings. Possibly this income of the policyholders could be imputed to the insurance company under other sections of the Code for other purposes.

The statutory scheme of the provisions of the Life Insurance Tax Act with which we here deal, however, are designed to prevent

an insurance company from distributing to its policyholders investment income on which it has not paid tax. The statute does not require treating as dividends to policyholders the theoretical distribution to policyholders of an insurance company's imputed income that it never received.

C. The government argues that under the rationale of our decision in *Lincoln National Life Insurance Co. v. United States,* 217 Ct.Cl. 515, 582 F.2d 579 (1978), American National's experience rating refunds were not return premiums. In *Lincoln National,* the plaintiff was obligated under its group insurance policies to pay a "retrospective refund" to its policyholders. For policies with an anniversary date falling after the end of the plaintiff's tax year, the plaintiff estimated the accrued refund and carried that amount in a reserve. The question was whether the refund reserve was deductible from the plaintiff's phase II income as a "reserve[ ] for dividends to policyholders" under section 811(b)(1)(A) and (B) of the Code. The court held that it was.

The court noted that "there [was] no dispute that the term 'dividends to policyholders' includes retrospective refunds such as those here involved. The parties have so stipulated, and Treas.Reg. § 1.811–2(a) [so] provides . . . ." 217 Ct.Cl. at 551, 582 F.2d at 599. Since, according to the government, those retrospective refunds are indistinguishable from experience rating refunds, *Lincoln National* indicates that experience rating refunds also are dividends to policyholders.

In *Lincoln National,* however, the court did not have to decide whether the definition of "dividends to policyholders" covered the retrospective refunds. The parties removed the issue from the case when they stipulated that the refunds were dividends. The court merely accepted the stipulation and did not decide the issue.

Moreover, the *Lincoln National* opinion does not provide a sufficiently detailed description of those retrospective refunds to determine whether they are equivalent to experience rating refunds. For all the opinion reveals, the retrospective refunds may have been a method for distributing divisible surplus. Even without the stipulation, we could not treat *Lincoln National* as controlling in this case.

D. The government also contends that we cannot decide this issue on summary judgment, but must remand the case for trial. It argues that because the terms "dividends to policyholders" and "return premiums" are terms of art in the insurance industry, expert testimony is required to determine their meaning. It further argues that there are several significant disputes as to material facts concerning American National's experience rating refunds.

The interpretation of statutes normally is a question of law, which does not require expert testimony. There may be exceptional circumstances in which expert testimony is helpful in interpreting and applying a statute. *See Consumer Life Insurance Co. v. United States,* 207 Ct.Cl. 638, 524 F.2d 1167 (1975), *aff'd,* 430 U.S. 725, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977) (expert testimony on state law to which statute referred); *Alinco Life Insurance Co.,* 178 Ct.Cl. at 841–42, 373 F.2d at 352–53 ("technical provisions" of section 801 of the Life Insurance Tax Act, which were "couched in language peculiar to the insurance industry").

In the present case, however, we see no need for expert testimony to aid us in interpreting and applying the particular provisions of the Life Insurance Tax Act involved. For the reasons we have given, we hold that the company's experience rating refunds are return premiums under the Act. In light of that conclusion, the facts the government contends are disputed are not material.

## V.

There are two other issues in the case that require only brief discussion.

A. The first claim of the petition involves the treatment of American National's due and unpaid, deferred and uncollected annuity premiums. The plaintiff moved under Rule 102(a)(2) to dismiss this claim with prejudice because it would pay less tax

through 1980 under the government's position than under its own.

The government initially opposed the motion. However, after the case was submitted, the parties entered into a stipulation settling that claim, and the plaintiff moved to withdraw its motion to dismiss the claim. We grant the motion and remand the case to the Trial Division for further proceeding in accordance with the stipulation.

■ B. The second claim (before us on cross-motions for summary judgment) raises the question whether American National's election under section 818(c)(2) of the Code to revalue its reserves requires a similar revaluation of the loading portion of its due and unpaid, deferred and uncollected life insurance premiums. In *Reserve Life Insurance Co. v. United States,* 226 Ct.Cl. ——, 640 F.2d 368 (1981), the court decided the identical issue in favor of the company. Both parties agree that *Reserve Life* is "on all fours" and requires judgment for American National on this issue.

The government argues that *Reserve Life* was decided incorrectly. However, it has not requested the court to hear this case *en banc. Reserve Life* is controlling and binds the panel on claim two.

## CONCLUSION

The plaintiff is entitled to recover on the return premium and revaluation issues. The plaintiff's motion for summary judgment on those issues is granted, and the government's cross-motion for summary judgment on the revaluation issue is denied. The plaintiff's motion to withdraw its motion for partial dismissal is granted. The case is remanded to the Trial Division to determine the amount of the plaintiff's recovery under the return premiums and revaluation claim, and for further proceedings on (1) the annuity premium claim in accordance with the stipulation, and (2) the remaining claims in the petition.