MODERN AMERICAN LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MODERN AMERICAN LIFE INSURANCE COMPANY, A MISSOURI CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17025-85, 31081-85.     Filed June 8, 1989.

*Raymond Turner,* for the petitioners.
*John Kent,* for the respondent.

PARR, *Judge:* Respondent determined the following deficiencies against Modern American Life Insurance Co. (petitioner) in the following years:

| Year | Deficiency |
| --- | --- |
| 1978 | $463,604 |
| 1979 | 676,450 |

Respondent also determined the following deficiencies against Progressive National Life Insurance Co. (Progressive) in the following years:

| Year | Deficiency |
| --- | --- |
| 1978 | $387,343 |
| 1979 | 350,376 |

Modern American Life Insurance Co., formerly known as Modern Security Life Insurance Co., merged with Progressive National Life Insurance Co. on September 30, 1983. On April 13, 1987, Modern American Life Insurance Co. moved under Rule 63(d)[1] to be substituted for Progressive National Life Insurance Co. as a party in this case under the name "Modern American Life Insurance Co., a Missouri Corporation." The motion was granted on April 22, 1987. Progressive National Life Insurance Co. and Modern American Life Insurance Co. were separate entities during the years in issue. For clarity, we continue to refer to the two companies as separate entities.

After concessions, we must decide: (1) Whether yearly distributions to policyholders designated as "guaranteed benefits"[2] were policyholder dividends or accrued policy benefits under section 809; (2) whether the reserves set aside to fund the payments were policyholder dividend reserves or life insurance reserves; and (3) whether petitioner is entitled to an operations loss carryback from 1981 to the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits are incorporated by this reference.

The findings of fact for petitioner and Progressive, are separated for clarity. However, the opinion section addresses both petitioner and Progressive together and the companies are sometimes referred to as petitioners.

### Modern American Life Insurance Company

Petitioner is a life insurance company organized under the laws of the State of Missouri. Petitioner's principal office was located in Englewood, Colorado, when it filed the petition in this case. Petitioner was known as Modern Security Life Insurance Co. prior to September 30, 1983;

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2] The term guaranteed payments will be used herein to refer to the disputed "guaranteed benefits."

and petitioner filed its Federal tax returns, Forms 1120L, with the Internal Revenue Service Center in Cincinnati, Ohio, for its taxable years ending December 31, 1978, and December 31, 1979.

Petitioner issued participating life insurance policies as part of its insurance business. A participating life insurance policy pays the policyholder annual dividends out of a portion of the surplus, if any, earned by the issuing company. Missouri law governs petitioner's distribution of policyholder dividends. Mo. Ann. Stat. sec. 376.360 (Vernon 1968). The determination of the amount of earned surplus is made after the close of an insurance company's fiscal year. Petitioner used a calendar year as its fiscal year.

Petitioner's board of directors held a special meeting on December 21, 1977, in lieu of its annual board of directors meeting. At that meeting petitioner's board adopted a resolution establishing "guaranteed benefit" payments for three types of participating life insurance policies previously issued by petitioner, numbered 352260, 532260, and 572262.

The resolution provided:

RESOLVED, that the Schedule of Guaranteed Benefits on Plan Code 352260 and 532260 attached hereto as Exhibit "B" and the Schedule of Guaranteed Benefits on Plan Code 572262 attached hereto as Exhibit "C" be, and they hereby are, approved; * * *

The schedule provided for the payment of a fixed dollar amount per $1,000 of face amount of insurance of a policy. The amount of the payment was dependent upon the policyholder's age at the time the policy was issued and either the duration or the age of the particular policy. The payments were to be made on the policy's anniversary date, i.e., the anniversary date of the inception of insurance coverage on the policy. The guaranteed payment also depended upon the policyholder's survival until his policy's anniversary date and upon premium payments through the policy's anniversary date.

The benefited policies were all participating life insurance policies. Thus, dividends were also paid on the policy anniversary date. In 1978 and 1979, when petitioner made the guaranteed payment, the level of dividends generally decreased. In fact, in 1979, the dividends decreased dollar for dollar by the amount made in guaranteed payments.

Petitioner's board of directors held another special meeting on December 28, 1978. The board adopted another resolution regarding the guaranteed payments to policyholders during 1979. The resolution applicable to 1979 was identical to the resolution adopted for 1978 except that in 1979 payments were expanded to cover policies with earlier issue dates than the originally benefited policies.

Petitioner distributed $371,326 in 1978 and $398,895 in 1979 in guaranteed payments, in accordance with the terms and restrictions of the above mentioned resolutions.

In a meeting on November 10, 1979, petitioner's board substantially expanded the level of previously established guaranteed payments for 1980. It increased the amount per $1,000 of policy coverage and extended the payment to additional policy plans. The resolution was much more detailed and specifically provided:

WHEREAS, high interest rates caused by inflation coupled with increasing policy cash values has caused some insurers to develop and market specialty insurance products designed to replace existing whole life insurance policies; and

WHEREAS, it is deemed to be in the best interest of the Company that it take steps to reduce the risk of replacement of its policies; and

WHEREAS, in the exercise of its business judgment this Board of Directors is of the opinion that the establishment of certain irrevocable benefits which the Company shall forever be legally obligated to pay each year to the holders of specified policy plans would tend to reduce the risk of replacement by other insurers and improve the results of the Company's conversion efforts;

NOW, THEREFORE, be it

RESOLVED, that the Company does hereby irrevocably grant, bargain, assign and convey unto the holders of the insurance policies issued or assumed by the Company under the Plan Codes listed below the right to receive, in addition to any other guaranteed benefits stipulated in said policies, level annual benefits in the amounts calculated in accordance with the Guaranteed Benefit Schedules attached as exhibits hereto and incorporated herein. The guaranteed benefit amounts, determined from the Guaranteed Benefit Schedule for the policy anniversary that falls within the calendar year 1980, will remain unchanged and will be paid on the policy anniversary and on each succeeding policy anniversary during the continuation of the policy on a premium paying basis. It is the express intent of this Board of Directors that the obligation to pay said level annual benefits shall be a legally binding and enforceable liability of the Company for 1979 and all subsequent years to be paid regardless of the future experience of the Company and without further action by the Board of Directors of the Company; and, be it further

RESOLVED, that the amounts of such guaranteed level annual benefits calculated in accordance with the Guaranteed Benefit Schedules attached as exhibits hereto and incorporated herein includes the amounts of all annual benefits *previously guaranteed* by this Board of Directors for payment to holders of policies under the Plan Codes specified herein and that this Board of Directors by these resolutions hereby ratifies and confirms such previously guaranteed benefits; and, be it further

RESOLVED, that to the extent, if any, that the Company is required to make any distribution to holders of any of the policies issued or assumed by the Company under the Plan Codes specified herein while the policies are in a premium paying status and not continued under any non-forfeiture provision, the payment of the guaranteed level annual benefits provided for herein shall, to the extent thereof, be deemed to satisfy said required distributions; and, be it further

RESOLVED, that the amounts of said guaranteed level annual benefits created, ratified or confirmed hereby, shall be those amounts calculated in accordance with the Guaranteed Benefit Schedules attached hereto as Exhibits "A" through "T" and incorporated herein * * * . [Emphasis in original.]

During 1977, 1978, and 1979 petitioner mailed anniversary notices to the policyholders of the benefited policies 21 days prior to each policy anniversary date. An "anniversary notice," in pertinent part, is as follows:

Anniversary Notice
Policy Number

| | | *Dividend |
|---|---|---|
| Deposit for Current Anniversary | | $ |
| Previous Deposits | | $ |
| Interest Earned on Previous Deposits | Rate 3.5 | $ |
| Total | | $ |

*Includes Guaranteed Benefit
[Policyholder's Name and Address]

Some of the policyholders with anniversary dates early in January received anniversary notices in December of the previous year.

Also during 1977, 1978, and 1979 petitioner sent the same policyholders a dividend statement, a sample of which is reproduced, in pertinent part, below:

Dividend Statement

| Policy Number | Current Option | Date of Dividend | | | Amount of Current Dividend |
|---|---|---|---|---|---|
| | | Mo | Day | Yr | $ |

Includes Guaranteed Benefits
[Policyholder's Name and Address]

Your policy has earned the above dividend which has been applied in accordance with the option last selected by you, or as provided for in the policy.

Future dividends will be applied in a like manner although you have the right to change this option by giving written notice to the home office.

The amount attributable to "Guaranteed Benefits" was not shown on either the anniversary notice or dividend statement, nor was there any indication that such benefits would continue. If a policyholder elected to receive the annual payment in cash, during 1978 and 1979 the policyholder received a check, the stub of which did indicate the portion of the distribution attributable to the policy dividend and the portion attributable to the guaranteed benefit. Again, there was no indication that the benefits would continue.

Benefited policyholders did not receive any separate written notice informing them of the board's resolution, nor did the policyholders ever manifest their assent to these "additional" benefits. Not unless a policyholder attempted to cancel his policy was he informed of this "additional" benefit which was not included on the face of his policy or in any written amendment thereto.

Each of the affected policies provided that the policy constituted the entire contract between the parties. The policies also provided that no modification of the policy would be valid unless it was in writing.

Petitioner established life insurance reserves for the guaranteed payments in 1977, 1978, and 1979. At the end of 1978, petitioner held $374,588 in these reserves and $1,230,970 at the end of 1979. Petitioner's actuaries figured the amount of the reserves based upon recognized mortality tables and assumed rates of interest.

The Division of Insurance of the State of Missouri requires insurance companies operating within the State to file an annual statement. In 1977, 1978, and 1979 petitioner reported these reserves for guaranteed annual benefits on line one of the "Liability, Surplus and Other Funds" section of the annual statement. Since these reserves were reported on line one, the State of Missouri required petitioner to deposit an aggregate sum of cash or securities which included the amount of these particular reserves. Mo. Ann.

Stat. sec. 376.170 (Vernon 1968). In contrast, under Missouri law the reserves for policyholder dividends did not increase the deposit obligation of petitioner. All required deposits were held by the Missouri insurance authorities.

The parties stipulated that petitioner is entitled to an operations loss carryback to 1978 and 1979 attributable to the operations loss in 1981 of $1,418,441. Petitioner has been allowed tentative operations loss carrybacks from 1981 for $424,805 for 1978, $285,291 for 1979, and $89,175 for 1980. The remainder of the loss, $619,170 was carried forward and completely used up by petitioner on its 1982 tax return.

### Progressive National Life Insurance Company

Progressive was a life insurance company organized under the laws of Missouri before it merged with petitioner on September 30, 1983. When it filed its petition in this case, Progressive's principal office was in Englewood, Colorado. According to the terms of the "Agreement and Plan of Merger" dated July 7, 1983, any claim existing or action or proceeding pending by or against Progressive may be prosecuted as if the merger had not taken place.

Progressive filed its Federal tax returns for the 1978 and 1979 taxable years, Forms 1120L, with the Internal Revenue office in Cincinnati, Ohio.

Progressive's Board of Directors held a special meeting on December 27, 1976, in which it adopted a resolution establishing the payment of "guaranteed benefits" on four participating policies previously issued by Progressive, numbered 552202, 552204, 552209, and 552210, payable for 1977. Like the guaranteed payments by petitioner, these payments provided a set amount to be paid per $1,000 of the face amount of coverage of each affected policy, dependent on: (1) The policyholder's age at the issuance of the policy and the duration or age of the policy; (2) the policyholder's survival through the policy anniversary date; and, (3) payment of premiums through the policy anniversary date.

Progressive's original resolution provided:

RESOLVED, that the attached benefit schedule for benefits which comprise a portion of any existing required distribution to policy owners

under the terms of life insurance contracts for Policy Plans 552202, 552204, 552209, and 552210 are hereby guaranteed for all issue years and the benefit schedule is hereby adopted for the life of the contract for as long as it may remain on current premium paying status.

At that same board of director's meeting, a previously adopted schedule of dividends was rescinded and a new schedule of dividends was adopted. In taking this action the minutes of the meeting state:

Mr. Lay reported that management of Progressive National Life had determined that certain benefits to policyholders under the terms of the life insurance contracts on certain plans of insurance could be guaranteed thus improving the conservation efforts in connection with such plans and perhaps aiding the marketing personnel in increasing life insurance coverage with those policyholders. Mr. Lay stated that in order to do so, the action of the Board of Directors in approving dividend schedules in a directors' meeting held July 12, 1976 would have to be rescinded and a new dividend schedule would need to be approved. * * *

Progressive was subject to one of its triennial examinations by the National Association of Insurance Commissions (NAIC) for 1976. The examination was completed in November of 1977. The NAIC was aware of the board's resolution concerning 1977 distributions. It commented on the need to clarify the resolution to indicate the company was going to pay level premiums, otherwise the company's reserve requirement would increase. In addition it stated:

Also, policyholders have not received a clear notice that certain amounts are now guaranteed. It is recommended this be done by endorsement or letter which a policyholder may keep with his policy. Such letter or endorsement must have the approval of the Missouri Division of Insurance and any other insurance department having jurisdiction.

Progressive, apparently did not heed NAIC's recommendation on either matter.

The resolution adopting guaranteed annual benefits for 1978 was, instead, less specific than the resolution for 1977. There was no mention that this was to be a continuing obligation. The resolution merely provided:

RESOLVED, that the Schedules of Guaranteed Benefits on Plan Codes 552202, 552204, 552209 and 552210, which are attached to the Minutes of this meeting as Exhibit "B" are incorporated herein, be; and the same

hereby are, approved as the Guaranteed Benefits on Said Plan Codes for the year ending December 31, 1978 * * *

The resolution adopted at the special meeting of Progressive's board of directors held December 28, 1978, for benefits in the 1979 year used the same language as the resolution for the 1978 year.

Finally, at the regular meeting of Progressive's board of directors held November 10, 1979, the board ratified and confirmed the level of guaranteed payments previously established and adopted a unified schedule format showing both the dividends and guaranteed payments payable on a particular plan. Specifically the resolution provided:

RESOLVED, that in the exercise of its business judgment this Board of Directors is of the opinion that the prior establishment of certain irrevocable benefits which the Company shall forever be legally obligated to pay each year to the holders of specified policy plans tends to reduce the risk of replacement by other insurers and to improve the results of the Company's conservation efforts; and, be it further

RESOLVED, that the Company does hereby irrevocably grant, bargain, assign and convey unto the holders of the insurance policies issued or assumed by the Company under the Plan Codes listed below the right to receive, in addition to any other guaranteed benefits stipulated in said policies, for all policy ages and durations listed on the below mentioned Guaranteed Benefit Schedules and during all periods that the policy is in a premium paying status level annual benefits in the amounts calculated in accordance with the Guaranteed Benefit Schedules attached as exhibits hereto and incorporated herein with the amount payable being determined by policy duration and issue age in the year in which said amounts were first guaranteed by this Board of Directors, it being the express intent of this Board of Directors that the obligation to pay said level annual benefits shall be a legally binding and enforceable liability of the Company for 1979 and all subsequent years to be paid regardless of the future experience of the Company and without further action by the Board of Directors of the Company; and, be it further

RESOLVED, that this Board of Directors acknowledges that the amounts of such guaranteed level annual benefits calculated in accordance with the Guaranteed Benefit Schedules attached as exhibits hereto and incorporated herein and on the basis of the policy duration and issue age in the year in which said amounts were first guaranteed is the same as the amounts of all annual benefits previously guaranteed by this Board of Directors for payment to holders of policies under the Plan Codes specified below and that this Board of Directors by these resolutions hereby ratifies and confirms such previously guaranteed benefits; and, be it further

RESOLVED, that to the extent, if any, that the Company is required to make any distribution to holders of any of the policies issued or assumed by the Company under the Plan Codes specified below while the policies are in a premium paying status and not continued under any non-forfeiture provisions, the payment of such guaranteed level annual benefits shall, to the extent thereof, be deemed to satisfy said required distributions; and, be it further

RESOLVED, that the amounts of said guaranteed level annual benefits ratified and confirmed hereby, shall be those amounts calculated in accordance with the Guaranteed Benefit Schedules attached hereto as Exhibits "K" through "M" and incorporated herein * * * .

After the resolution adopted on November 10, 1979, no further resolutions regarding guaranteed payments were passed by Progressive, although distributions were made in accordance with the above mentioned schedules through September 30, 1983, when Progressive merged with petitioner. Progressive made guaranteed payments of $270,020 during 1978, and $261,295 during 1979.

As was the case with petitioner, the benefited policies were all participating life insurance policies; as such, dividends were also paid during the years in issue. Progressive reduced the distributions designated as "dividends" while it paid the "guaranteed benefits." In 1979, the amount of dividends was reduced dollar for dollar by the amount of guaranteed payments.

During 1976 through 1979, policyholders received an anniversary notice 21 days before the policy anniversary date. Like petitioner's anniversary notices, the notice specified that any policyholder dividend payable included the guaranteed benefits. If a policyholder's anniversary date occurred in early January, that policyholder received notice in the previous year.

Progressive also mailed dividend statements 21 days before the policy anniversary date. Again, like petitioner's dividend statement, this statement indicated that the dividend payable included the guaranteed benefit. No breakdown was shown on either statement. Likewise, if a policyholder elected to have the annual policy distributions made in cash, the check stub indicated which portion was attributable to the "guaranteed benefit" and which portion was attributable to the "dividend." Again, there was no

indication that benefits would continue beyond the current year.

Policyholders did not receive any separate written notice informing them of the Board's resolution, nor did any of the policyholders assent to these "additional" benefits. However, if a policyholder attempted to cancel his policy he was informed of this "additional" benefit which was not included on the face of his policy or in any written amendment to the policy.

Each of the affected policies provided that the policy constituted the entire contract between the parties. The policies also provided that no modification of the policy would be valid unless it was in writing.

Progressive established life insurance reserves for the guaranteed payments. At the end of 1978, Progressive held $232,188 in these reserves and at the end of 1979, Progressive held $220,579. Progressive's actuaries figured the amount of the reserves based upon recognized mortality tables and assumed rates of interest.

In 1977, 1978, and 1979, Progressive reported the reserves for these guaranteed annual benefits on line one of the "Liability, Surplus and Other Funds" section of the annual statement. Since these reserves were reported on line one, Missouri required Progressive to deposit an aggregate sum of cash or securities which included the amount of these particular reserves. Mo. Ann. Stat. sec. 376.170 (Vernon 1968). In contrast, the reserves for policyholder dividends did not increase the deposit obligation of Progressive. All of the required deposits were held by the Missouri insurance authorities.

## OPINION

The first issue we must decide is whether amounts paid to policyholders in 1978 and 1979 pursuant to the boards of directors' resolutions are policyholder dividends deductible under section 809(d)(3) or accrued benefits deductible under section 809(d)(1) [now sections 805(a)(3) and 805(a)(1)]. If the distributions are policyholder dividends, as respondent contends, then the amount of the deduction is limited to the excess of gains from operations without regard to the dividend deduction over taxable investment income, plus

$250,000. Sec. 809(f) [now see sec. 808(c)]. On the other hand, if the payments are part of "All claims and benefits accrued * * * on insurance and annuity contracts," then there is no limit to the amount of the deduction.

Relying primarily upon the language of sections 809(d)(1) and 811(a) and sections 1.809-5(a) and 1.811-2(a), Income Tax Regs., respondent contends that the guaranteed payments were not "fixed in the contract," but are merely redesignated policyholder dividends or "similar payments." Respondent denies that State law controls the definition of a policyholder dividend or similar payment; and that in any event, these payments were not in actuality a fixed obligation of petitioners.

Petitioners respond that under State law, which petitioner contends is controlling, the guaranteed payments were policy benefits, not dividends. Petitioners do not allege (as they cannot) that these benefits are found in the four corners of the written contract or an amendment thereto. Petitioners assert instead that the unilateral increases by board resolution were binding and enforceable under State law, became a part of the contract as a matter of law, and are therefore "fixed policy benefits" (a phrase not found in the statute or regulation).

For the reasons outlined below, we hold that the annual payments made by petitioners were policyholder dividends.

### The Statutory Framework—Internal Revenue Code

We begin our analysis by looking to the words of the statute and the regulations.[3] We consider all facts and circumstances in making our determination.

Section 809(d)(1) provides a deduction for "All claims and benefits accrued, * * * during the taxable year on insurance and annuity contracts (including contracts supplementary thereto)." This deduction is further defined in section 1.809-5(a)(1), Income Tax Regs., as:

All claims and benefits accrued (less reinsurance recoverable), and all losses incurred (whether or not ascertained), during the taxable year on insurance and annuity contracts (including contracts supplementary thereto). The term "all claims and benefits accrued" includes, for

---

[3]For a discussion of the operation of subch. L, see *North Central Life Insurance Co. v. Commissioner,* 92 T.C. 254 (1989).

example, matured endowments and amounts allowed on surrender. The term "losses incurred (whether or not ascertained)" includes a reasonable estimate of the amount of the losses (based upon the facts in each case and the company's experience with similar cases) incurred but not reported by the end of the taxable year as well as losses reported but where the amount thereof cannot be ascertained by the end of the taxable year.

Section 1.809-5(a)(3), Income Tax Regs., does not specifically define policyholder dividends but states that these dividends are determined under section 811 and section 1.811-2, Income Tax Regs.

Under section 811(a), a policyholder dividend is defined as "dividends and similar distributions to policyholders in their capacity as such. Such term does not include interest paid (as defined in section 805(e))."

Policyholder dividends are further defined by section 1.811-2(a), Income Tax Regs., as:

(a) *Dividends to policyholders defined.* * * * dividends and similar distributions to policyholders in their capacity as such. *The term includes amounts returned to policyholders where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management. In general, any payment not fixed in the contract which is made with respect to a participating contract* (that is, a contract which during the year contains a right to participate in the divisible surplus of the company) *shall be treated as a dividend to policyholders.* Similarly, any amount refunded or allowed as a rate credit with respect to either a participating or nonparticipating contract shall be treated as a dividend to policyholders if such amount depends upon the experience of the company. However, the term does not include interest paid (as defined in section 805(e) and paragraph (b) of sec. 1.805-8) or return premiums (as defined in section 809(c) and paragraph (a)(1)(ii) of sec. 1.809-4). Thus, so-called excess interest dividends and amounts returned by one life insurance company to another in respect of reinsurance ceded shall not be treated as dividends to policyholders even though such amounts are not fixed in the contract but depend upon the experience of the company or the discretion of the management. [Emphasis added.]

Generally speaking, a dividend on an insurance contract represents either a return of unearned premiums to the insured or a proportional distribution of profits. 6 G. Couch, Insurance 2d, sec. 34:118 (2d ed. 1985). This definition is not explicitly reflected in section 811 and the regulations thereunder. One court has noted, however, that the floor debates on the Life Insurance Company Income Tax Act of

1959, indicate that Congress was aware that " 'dividend' as used in the insurance industry is a term of art which means almost any payment not derived from premium income." *Republic National Life Ins. Co. v. United States,* 594 F.2d 530, 536 (5th Cir. 1979). In addition, courts have recognized that it was Congress' intent to tax the return of investment income to participating policyholders. *Prairie States Life Ins. Co. v. United States,* 828 F.2d 1222, 1225-1226 (8th Cir. 1987); *American National Life Ins. Co. v. United States,* 231 Ct. Cl. 604, 690 F.2d 878 (1982).

The area of accrued benefits has not been previously explored by any court. Section 809(d)(1) merely states that all claims and benefits accrued on insurance and annuity contracts during the taxable year fall under that section. The regulations add that the term "all claims and benefits accrued" includes, for example, amounts allowed on surrender and matured endowments. Neither the code nor the regulations tell us anything regarding the characteristic of the payment. Also, unlike either dividends or return premiums, there is no clear indication as to the ultimate source of these payments (i.e., it seems irrelevant whether the payment comes from premiums or investment income).

From the words of the statute we are able to determine, however, that accrued benefits, unlike dividends, are not paid "to the policyholder in his capacity as such." This is obvious because death benefits, which go to beneficiaries and not to policyholders, are included.

Another distinction may be drawn between policyholder dividends and "accrued benefits." Policyholder dividends are not "fixed in the contract." Sec. 1.811-2(a), Income Tax Regs. While not stated explicitly, it seems evident that "accrued benefits" are, conversely, the type of benefits that *are* fixed in the contract. For example, death benefits, endowment benefits, and cash surrender benefits are all specified in the terms of insurance or annuity contracts. What's more, all of these benefits are bargained-for benefits. That is, the cost to the insured is based upon the benefits that the insured chooses to buy. Conversely, the amounts paid as dividends are determined unilaterally by the insurance company. Clearly, in one sense dividends are "benefits" the participating policyholder buys, but unlike the

other types of benefits, they are not a specified amount the insured knows he is going to receive when he signs the contract.

In this case the so-called guaranteed benefits were not "fixed in the contract." That is, a policyholder's entitlement to this benefit was not contained in the four corners of the instrument and there were no riders, endorsements, or supplemental contracts signed by the insurance company and the insured relating to the benefit. Petitioners argue, in effect, that "fixed in the contract," means the same thing as required by law. Since the continuing payment of these benefits would have been required under Missouri law, so they contend, the benefits were "fixed policy benefits" and are therefore not policyholder dividends. We do not agree that State law controls the definition of "dividend" for Federal tax purposes. Nor are we persuaded that the benefits in question were actually required to be paid in subsequent years under State law, and were thus incorporated into the contract.[4]

## Effect of State Law

Petitioners ask us to consider State law in two contexts. First, petitioners argue that the Code and regulations leave the definition of "dividend to policyholders" to State law. We disagree.

State law defines and regulates relationships between parties, i.e., when a dividend is permissible or required for State law purposes. However, the determination by the State that a payment constitutes a dividend does not necessarily mean such payment is a dividend for Federal tax purposes. Conversely, the fact that a payment is *not* a dividend for State law purposes is not determinative for Federal tax purposes. If the Federal tax statute does not plainly indicate a purpose or intent for State law to be taken into account, taxability of corporate distributions are determined in accordance with Federal law. *Helvering v. Northwest Steel Rolling Mills, Inc.*, 311 U.S. 46 (1940); *Lundeen v. Commissioner*, 33 T.C. 19 (1959). This is similar to those cases where a business association is classified one

---

[4]We thus do *not* decide whether enforceability of payment, by the State, standing alone, would change the result herein.

way for State law purposes and another for Federal tax purposes. See, e.g., *Burk-Waggoner Oil Association v. Hopkins,* 269 U.S. 110 (1925) (holding associations considered partnerships under State law were nevertheless taxable as corporations); *Wholesalers Adjustment Co. v. Commissioner,* 88 F.2d 156 (8th Cir. 1937) (holding that in determining an organization is an association for Federal tax purpose, it is irrelevant whether it would be classified as such under State law or common law).

Furthermore, section 811 specifies that *dividends and similar distributions* are deductible as policyholder dividends under section 809. Obviously State insurance laws cannot define a "similar distribution." The determination of what constitutes a dividend or similar distribution is necessarily a question of Federal tax law.

Second, petitioners argue that all the rights policyholders would enjoy under State law are automatically incorporated as a part of the contract. Petitioners tried to establish through the testimony of Mr. Jourdon, a previous Chief Examiner of the Missouri Division of Insurance, that the State would have construed the additional benefits voted by the board for 1978 and 1979 as being payable throughout the life of the contract. Petitioners further contend that if petitioners had failed to pay the benefits—for any reason other than insolvency—the State would have enforced a claim by policyholders.

Petitioners' argument must fail. It is based on speculation within speculation. Petitioners are saying, in effect, that:

*if* the policyholders had come to learn they were entitled to additional benefits (of which they were never clearly told); *and if* a claim were made based upon the Board resolutions pertaining to 1977 and 1978;

*and if* petitioners had refused to pay—*then* the State would have found the Board resolutions to have been binding in subsequent years *and* the State would have enforced the claim.

None of this ever occurred.

We are not persuaded, moreover, that petitioner itself intended the resolutions regarding 1978 and 1979 to be effective beyond those years, absent further corporate action. This is strongly suggested by reenactment of 1977's

resolution with a nearly identical resolution in 1978 (a superfluous act if the earlier benefit were already irrevocably "fixed in the contract").

Not until November 28, 1979—with regard to 1980—was specific language used establishing "certain *irrevocable* benefits which the company shall forever be legally obligated to pay." Such language is conspicuous by its absence during the years in issue.

Likewise, Progressive's resolutions for 1978 and 1979 made no mention of any continuing obligations to pay. This is particularly striking in light of the language used in a resolution affecting a prior year 1977 (not in issue). That resolution said, in part, "the benefit schedule is hereby adopted for the life of the contract." Again, however, the question arises: if the benefits were to continue, why was it necessary to authorize them again in later years? Moreover, Progressive ignored NAIC's recommendation to give clear notice to policyholders, and instead adopted language that could have been construed as effective only for the year specified.

As in the case of petitioner, the language of Progressive's resolution changed for the 1980 year. That resolution referred to "irrevocable benefits which the Company shall forever be legally obligated to pay each year."

We do not decide whether such language would suffice to bring the benefits paid within the ambit of section 809(d)(3). The 1980 year is not before us. The point is that both petitioners knew how to talk about irrevocability if that was intended.

On this record we simply cannot find that under Missouri law an obligation to pay the approved benefits extended beyond the next succeeding year. We therefore hold that the benefits were not "fixed in the contract" within the purview of section 1.811-2(a), Income Tax Regs.

### Other Indicia of Dividends and Similar Distributions

Besides being "payments not fixed in the contract" under section 1.811-2(a), Income Tax Regs., the benefits in issue were distributions similar to dividends in other respects.

First, they were made to policyholders who had a right to participate in the divisible surplus of the company—that is,

to the very persons who would otherwise receive payments in the form of dividends. In fact, simultaneously with increasing the benefits, petitioners greatly reduced dividends. In 1979, the reduction was dollar for dollar.

Second, during the years in issue, the amounts of the payments depended solely on the discretion of management. The benefits were unilaterally increased by the directors, not bargained for by the policyholders. Moreover, in every case, the decision to increase benefits and decrease dividends was made near the end of the year when the experience of the company was known and profitability foreseeable.

Third, the element of secrecy concerning the increased benefits strongly implies an intent by management to maintain discretion and flexibility concerning payment in subsequent years, rather than an intent to give policyholders an irrevocable right to legally enforce future payments. A policyholder was not explicitly told of the increased benefits until and unless she tried to cancel the policy in the mistaken belief it was not competitive with another insurer. Otherwise, she merely continued to receive a single yearly check, similar to the dividend check received in prior years. The only change was that the stub now showed a portion of the total was a "dividend" and a portion a "benefit." Certainly a policyholder would not deduce from the check stub that the "benefit" would continue into subsequent years. Our position is further supported by the fact that petitioners never actually amended the affected policies to include the "guaranteed" benefits, *a process required by the terms of the contract in order to modify the contract.* No rider or endorsement was ever sent to policyholders, despite NAIC's explicit recommendation.

### Characterization of Reserves

Having determined that the payments are dividends or similar distributions to policyholders, we now examine whether the reserves for those payments are life insurance reserves or policyholder dividend reserves.

It is undisputed that petitioners funded reserves for these payments by giving securities to the State, in trust, to cover the obligation.

Not coincidentally, each party bases its arguments as to the appropriate reserve treatment on its espoused treatment of the payment itself. Additionally, however, petitioners assert that under section 818, NAIC accounting practices are appropriate for tax purposes unless specifically usurped by accrual method accounting procedures. We assume without deciding that under NAIC rules petitioners were required to report the amount as a liability for life reserves and that the correct *accounting* treatment is to consider the reserves "life insurance reserves." Petitioners then argue that NAIC *categorization* of liabilities also controls for Federal tax purposes. The question then becomes, if the payments are dividends for Federal tax purposes, but are not dividends for State insurance law purposes, are the reserves for these payments correctly treated as policyholder dividend reserves under section 1.811-2(c), Income Tax Regs., or life insurance reserves within the meaning of section 801(b)(1) and (b)(2)?

A reserve must meet the following requirements in order to be considered a life insurance reserve under the Code and Regulations—

1. They must be "computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest." Section 801(b)(1)(A).

2. They must be "set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance * * * contracts * * * involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies." Section 801(b)(1)(B).

3. They must be required by law. Section 801(b)(2), and

4. They must be actually held by the company during the taxable year for which the reserve is claimed. Section 1.801-4(a), Income Tax Regs.

Conversely, policyholder dividend reserves are defined in section 1.811-2(c), Income Tax Regs., as:

(1) *In general.* * * * means only those amounts—

(i) Actually held or set aside as provided in subparagraph (2) of this paragraph and thus treated as actually held, by the company at the end of the taxable year, and

(ii) With respect to which, at the end of the taxable year or, if set aside, within the period prescribed in paragraph (2) of this paragraph, the company is under an obligation, which is either fixed or determined according to a formula which is fixed and not subject to change by the company, to pay such amounts as dividends to policyholders (as defined in section 811(a) and paragraph (a) of this section) during the year following the taxable year.

(2) Amounts set aside. (i) In the case of a life insurance company * * * all amounts set aside before the 16th day of the 3rd month of the year following the taxable year for payment of dividends to policyholders * * * during the year following such taxable year shall be treated as amounts actually held at the end of the taxable year.

Sections 1.801-4(e)(8) and (9), Income Tax Regs., state that life insurance reserves do not include

(8) Liability for annual and deferred dividends declared or apportioned.
(9) Liability for dividends left on deposit at interest.

Since we have determined that the payments were dividends or similar distributions, the amounts were set aside for the payment of dividends or similar distributions. Therefore the reserve is correctly treated as a reserve for dividends to policyholders.

### Loss Carrybacks from 1981

Petitioner was allowed tentative carrybacks for an operations loss incurred in 1981 to the 1978 and 1979 taxable years. Respondent now contests the amount of the carrybacks. However, the parties stipulated that petitioner is entitled to operations loss carrybacks to 1978 and 1979 attributable to the operations loss of $1,418,441 generated in 1981. Rule 91(e) states that a stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation unless otherwise permitted by the Court or agreed upon by the parties. Based upon the stipulation we hold for petitioners on this point.

In light of concessions and to reflect the foregoing,

*Decisions will be entered under Rule 155.*