**UNUM CORPORATION and Unum Life Insurance Company of America, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civil No. 93–369–P–C.

United States District Court, D. Maine.

May 23, 1996.

16

William J. Kayatta Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Maine, Barbara H. Furey, Barry W. Larman, Unum Life Insurance Company, Portland, Maine, for Plaintiffs.

David R. Collins, Asst. U.S. Atty., Office of the U.S. Attorney, Portland, Maine, Scott H. Harris, U.S. Department of Justice, Tax Division, Washington, D.C., for Government.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

Plaintiffs UNUM Corporation ("UNUM Corp.") and UNUM Life Insurance Company of America ("UNUM America") sue Defendant United States of America ("the Government" or "the IRS") seeking a tax deduction valued at approximately eighty million dollars. Plaintiffs claim that the cash and stock distributed to their policyholders pursuant to Plaintiffs' Plan of Recapitalization and Conversion, Stipulated Record (Docket No. 42) Ex. 16 ("the Plan"), constitute "policyholder dividends" as defined in § 808 of the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* ("the Code" or "I.R.C."), and so are deductible from income pursuant to § 805(a)(3) of the Code. Having denied Defendant's Motion for Summary Judgment, Memorandum and Order Denying Defendant's Motion for Summary Judgment (Docket No. 40), the Court now considers this case for final decision on a stipulated record. *See* Stipulated Record (Docket No. 42) ("Record"). For the reasons discussed below, the Court will find that neither the cash distribution nor the stock distribution constitutes a "policyholder dividend" and, therefore, that neither distribution is deductible from Plaintiffs' income.

### I. FACTS

Union Mutual Life Insurance Company ("Union Mutual") was organized as a mutual insurance company in Maine in 1848. Record Ex. 31. At all times relevant to this action, Union Mutual was engaged in the business of writing various forms of life insurance, health and accident insurance, and annuity products. *Id.* ¶ 1. As with mutual companies generally, Union Mutual had no outstanding capital stock and so was not owned by stockholders. *Id.* ¶ 4. As with mutual insurance companies generally, Union Mutual was owned, instead, by its participating policyholders. *Id.* Ex. 8 at 6, Ex. 12 at 15.

Union Mutual's participating policyholders owned the company by virtue of having contributed to Union Mutual's surplus by paying premiums that exceeded the actuarial cost of their policy coverage. Plaintiffs' Trial Brief (Docket No. 44) at 4–5, 18–19 ("Plaintiffs' Brief"); United States' Trial Brief (Docket No. 43) at 3–4 ("Government's Brief"); Record Ex. 8 at 6, Ex. 12 at 15. These excess amounts functioned in a way analogous to the capital raised when a stock insurer makes an offering of its stock. Plaintiffs' Brief at 12–13; Plaintiffs' Reply Brief (Docket No. 45) at 5; Government's Brief at 3–4. Accordingly, in proportion to that contribution to surplus, each Union Mutual policyholder had certain rights analogous to those of a stockholder, such as voting rights and preemptive rights upon conversion. Plaintiffs' Brief at 18–19; Government's Brief at 3–4; Record Ex. 4 at 5; Plan at A–2.

Taken as a whole, the surplus to which Union Mutual policyholders contributed represented the sum of all revenues in excess of the amount paid or accrued for benefits, reserves, dividends, taxes, and other expenses. Record ¶ 7. As such, Union Mutual's surplus also provided the source from which policyholder dividends were drawn in an amount determined by Union Mutual management on an annual basis. *Id.* Ex. 8 at 6.

As of December 31, 1985, Union Mutual had accumulated surplus, determined on the basis of generally accepted accounting principles ("GAAP"), in the amount of $652,050,097 ("GAAP Surplus"). *Id.* ¶ 9.

### A. Formulation of the Recapitalization and Conversion

In December 1984, Union Mutual submitted its initial Plan of Recapitalization and Conversion, Record Ex. 9 ("Initial Plan"), to the Maine Superintendent of Insurance for approval. Record ¶ 15, 16. The Initial Plan detailed a transaction whereby Union Mutual would convert from a mutual insurer to a stock insurer that would be wholly-owned by a new holding company. *See* Initial Plan. The approval process was directed at ensuring that the Initial Plan complied with Maine law governing such a conversion. *See* 24–A

M.R.S.A. § 3477. To that end, between June 1985 and July 1986, the Superintendent issued two legal rulings regarding the Initial Plan, and the Union Mutual Board of Directors amended the Initial Plan four times. Record ¶¶ 17–22, Exs. 10–15. Finally, on August 8, 1986, the Superintendent issued a Final Decision and Order approving the final version of the Plan. *Id.* ¶ 24, Ex. 17.

Among other things, the final Plan provides that "[i]n exchange for their Membership Interests, Eligible Policyholders will receive Conversion Stock or cash, all as described in Part VII of this Plan." Plan at A–4. Part VII, entitled "Subscription Offering," begins as follows:

A. *Eligible Policyholders.*

1. *Equity Share.* In order to determine the consideration to be provided to Eligible Policyholders in exchange for their Membership Interests, an amount equal to the Adjusted Surplus of Union Mutual shall be allocated among such Eligible Policyholders in accordance with the formulas [provided elsewhere in the Plan for calculating each Eligible Policyholder's Equity Share]. Each Eligible Policyholder's allocation as so determined shall be that Eligible Policyholder's Equity Share.

Plan at A–4. Eligible Policyholders would receive their Equity Share in the form of Conversion Stock unless they qualified as "Cash Option Eligible Policyholders," in which case, they could choose to receive the same Equity Share in the form of cash. Plan at A–1, A–5. Moreover, once Eligible Policyholders thus exchange their Membership Interests for their Equity Shares (whether in stock or cash) of the Adjusted Surplus, "present and past policy and contract holders will have no Membership Interests in Union Mutual." Plan at A–4.

The Plan also provides three particularly important definitions, which this Court hereby adopts, for terms used above to describe the transaction. First, "Membership Interest" is defined as:

all rights and interests of each policy and contract holder of Union Mutual including, but not limited to, any right to vote, any

rights which may exist with regard to the surplus of Union Mutual not apportioned by the Board for policyholder dividends, and any rights in liquidation or reorganization of Union Mutual, but shall not include any other right expressly conferred by a policyholder's insurance policy or contract.

Plan at A–3. Second, "Equity Share" is defined as "the dollar amount of that part of Union Mutual's Adjusted Surplus attributable to that Eligible Policyholder on the basis of the formulas [provided elsewhere in the Plan for calculating Equity Share.]" Plan at A–1. Third, "Adjusted Surplus" is defined as "the amount of surplus as of December 31, 1985 ... [as determined] in accordance with generally accepted accounting principles. . . ." Plan at A–1.

Maine law requires such a conversion plan to be approved by at least two-thirds of those policyholders who vote on it. *See* 24–A M.R.S.A. § 3477(2)(B). The Plan was approved by ninety-eight percent of those Eligible Policyholders who voted on it. Record ¶ 29.

## B. *Execution of the Recapitalization and Conversion*

The following series of transactions (collectively "Recapitalization and Conversion") occurred on or about November 14, 1986, the effective date of the Plan. Record ¶ 32. Union Mutual disbursed $129,129,082 in cash by check to the 105,098 Cash Option Eligible Policyholders who chose to exercise that option. *See id.* Ex. 24, ¶ 33. Union Mutual charged this entire amount against its statutory and GAAP surplus. *Id.* ¶ 34.

Union Mutual amended its charter both to convert the company from a mutual insurer to a stock insurer and to change the company name to UNUM Life Insurance Company ("UNUM Life"). *Id.* ¶¶ 5, 31, 32.

UNUM Life delivered all 6,000,000 of its newly-minted shares of stock to the new holding company, UNUM Corp. *Id.* ¶¶ 35, 36, Ex. 22. "[I]n consideration for" those 6,000,000 shares of UNUM Life stock, UNUM Corp. issued 20,489,072 [1] shares of

---

1. This finding of fact is based upon the parties' stipulation that UNUM Corp. distributed 20,489,-

UNUM Corp. stock to the remaining 58,561 Eligible Policyholders. *Id.* ¶ 37, Ex. 22, 24. At a fair market value of $25.50 per share on the effective date, the total value of the UNUM Corp. Conversion Stock distribution to those Eligible Policyholders was $522,471,-336. *Id.* ¶ 38, Ex. 24.

In addition, to the extent that the value of the Equity Share of those 58,561 Eligible Policyholders exceeded the value of a whole number of UNUM Corp. shares by the value of some fractional share, Union Mutual distributed to those Eligible Policyholders an additional $609,396 in cash to represent the value of those fractional shares. *See Id.* Ex. 24, ¶ 33.[2]

By the conclusion of the Recapitalization and Conversion, 163,659 Eligible Policyholders had received distributions of cash and stock in the amount of $652,209,814.[3] *Id.* Ex. 24, ¶ 45.

## C. Taxation of the Recapitalization and Conversion

The process of determining the federal tax consequences of the Recapitalization and Conversion began on October 12, 1984, over two years before the effective date of the Plan, when Union Mutual's tax counsel submitted a request for a letter ruling to the IRS. Record ¶ 11, Ex. 4. In that request, Union Mutual sought to convince the IRS that the distribution of UNUM Corp. stock in exchange for Membership Interests in Union Mutual constituted a tax-free exchange under I.R.C. § 351, and that the conversion of those Membership Interests into UNUM Life stock constituted a tax-free recapitalization under I.R.C. § 368(a)(1)(E). *Id.* Ex. 4 at 22, 24.

During the years 1984 through 1986, Union Mutual's tax counsel made numerous addi-

tional submissions to the IRS pertaining to the initial request. *Id.* ¶ 11, Ex. 5. One such submission, dated November 8, 1985, discussed the issue of whether the distribution of cash in exchange for Membership Interests should be treated as a "redemption" in exchange for Membership Interests under I.R.C. § 302 or as a "policyholder dividend" under I.R.C. § 808 but did not request a letter ruling on that issue. *Id.* Ex. 5.

On December 16, 1986, the IRS issued its letter ruling to Union Mutual regarding the Recapitalization and Conversion. Record ¶ 12, Ex. 6 ("Letter Ruling"). The Letter Ruling agreed with Union Mutual's characterization of the stock distribution as a tax-free exchange under § 351 and of the conversion as a tax-free recapitalization under § 368(a)(1)(E). Letter Ruling at 9, 11. The Letter Ruling added that the cash distribution should be treated as a "redemption" under § 302 rather than a "policyholder dividend" under § 808. Letter Ruling at 12.

Beginning with the taxable year ending December 31, 1986, UNUM Life joined in the filing of a life-nonlife consolidated tax return with its parent, UNUM Corp., and with its other affiliates. Record ¶ 48. The original federal income tax return filed for that year did not seek a deduction for any part of the cash or stock distributed pursuant to the Plan. *Id.* ¶ 49, Ex. 25. Since then, UNUM Life has merged with and into UNUM Life Insurance Company of America ("UNUM America"), which remains Union Mutual's surviving corporate successor and a wholly-owned subsidiary of UNUM Corp. *Id.* ¶¶ 53, 54, 56.

On May 15, 1992, current Plaintiffs, UNUM Corp. and UNUM America, timely filed refund forms claiming that the cash ($129,738,478) distributed to Eligible Policyholders pursuant to the Plan on its effective

---

072 shares of its own stock to Eligible Policyholders as part of the Recapitalization and Conversion. Record Ex. 24. This Court disregards other indications in the record that 20,508,915 shares were issued. *See id.* Ex. 22.

**2.** In addition to the above distributions to Eligible Policyholders, the Recapitalization and Conversion involved other transactions, including the sale of UNUM Corp. stock at $25.50 per share to employees and to the general public, as well as

the investment of capital by UNUM Corp. in subsidiaries of the former Union Mutual. Record ¶¶ 34, 41.

**3.** This total exceeds GAAP Surplus by less than one-twentieth of one percent because of distributions made after November 14, 1986, but before December 31, 1986, to a small number of belatedly identified Eligible Policyholders. *See* Record Ex. 24.

date was deductible as a "policyholder dividend" under I.R.C. §§ 805(a)(3) and 808. *Id.* ¶ 50, Ex. 26. On September 25, 1992, Plaintiffs timely filed refund forms claiming that the fair market value of the UNUM Corp. stock ($552,471,336) distributed to Eligible Policyholders pursuant to the Plan on its effective date was deductible as a "policyholder dividend" under I.R.C. §§ 805(a)(3) and 808. *Id.* ¶ 51, Ex. 27.

On March 12, 1993, the IRS sent a letter to Plaintiffs proposing to disallow the refund claims. *Id.* ¶ 52. On December 29, 1993, after protesting this proposed disallowance administratively through the IRS Appeals Office, Plaintiffs filed this suit to obtain the refunds. *Id.* ¶ 52; *see* Complaint (Docket No. 1).

## II. DISCUSSION

The dispositive issue in this case[4] is whether the Recapitalization and Conversion distributions of cash and UNUM Corp. stock to former Union Mutual policyholders fall within the definition of "policyholder dividend" contained in I.R.C. § 808 and are, therefore, deductible under I.R.C. § 805(a)(3).[5] The Court finds that neither the cash nor the stock distribution constitutes a "policyholder dividend" for two reasons: (1) neither distribution is a "dividend or similar distribution" as required by § 808(a); and (2) the amount of neither distribution "depends on the experience of the company or the discretion of the management" as required by § 808(b)(1).

### A. Structural Overview

The analysis must begin by identifying the applicable provisions of the Internal Revenue Code and describing the relationship among those provisions.

Subchapter C of the Code applies to all corporations, which include insurance companies. *See* I.R.C. §§ 301, 7701(a)(3). Among those insurance companies to which subchapter C applies are life insurance companies, both stock and mutual. *See Duffy v. Mutual Benefits Life Ins. Co.*, 272 U.S. 613, 616, 47 S.Ct. 205, 205, 71 L.Ed. 439 (1926). Subchapter L also applies to insurance companies. *See* I.R.C. § 801. Among those insurance companies to which subchapter L applies are life insurance companies, both stock and mutual. *See* I.R.C. §§ 801–818.

■ Subchapter C, then, governs the taxation of life insurance companies, both stock and mutual, "[e]xcept to the extent that [subchapter L makes] specific provision." H.R.Rep. No. 34, 86th Cong., 1st Sess. (1959), *reprinted in* 1959–2 C.B. 736, 750; S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959–2 C.B. 770, 798. Such specific provisions of subchapter L are construed narrowly because they bestow tax benefits on insurers not generally available to other taxpayers. *Nat'l Life and Accident Ins. Co. v. United States*, 385 F.2d 832, 833 (6th Cir.1967). Moreover, provisions defining the scope of a deduction, regardless of their location in the Code, are construed strictly. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84, 112 S.Ct. 1039, 1042–43, 117 L.Ed.2d 226 (1992). Finally, "the burden of clearly showing the right to the claimed deduction is on the taxpayer," for "an income tax deduction is a matter of legislative grace." *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943).

■ The specific provision here at issue, the § 808 definition of a deductible "policyholder dividend," appears in subchapter L

---

4. In the course of opposing Plaintiffs' contentions, the Government claims that the cash distributions constitute redemptions under I.R.C. § 302 and that the stock distributions constitute exchanges under I.R.C. § 351. *See* Government's Brief at 19–23. It is not necessary to reach the Government's claims regarding §§ 302 and 351 in order to address the dispositive issue, *i.e.*, whether the cash and stock distributions constitute "policyholder dividends" under I.R.C. § 808. Therefore, the Court will not reach the Government's claims regarding §§ 302 and 351.

5. Section 805(a)(3) of the Code provides:

**§ 805. General Deductions**
   (a) **General rule.**—For purposes of this part, there shall be allowed the following deductions:

   . . . . .

   (3) **Policyholder dividends.**—The deduction for policyholder dividends (determined under section 808(c)).

and defines the scope of a deduction. This Court, therefore, will construe the definition of "policyholder dividend" strictly.[6] Such a strict construction of this specific provision of subchapter L will correspondingly displace the operation of subchapter C only very little. Finally, Plaintiffs may not prevail unless they meet their burden of proving clearly that the distributions fall within that narrow deduction.

It is within this broader framework that the Court now examines the precise language of § 808.

### B. Is Either Distribution a "Dividend or Similar Distribution" Under § 808(a)?

Section 808(a) defines a "policyholder dividend" as "any dividend or similar distribution to policyholders in their capacity as such." I.R.C. § 808(a).[7] The parties to this action differ primarily over the meaning of "any dividend or similar distribution." Plaintiffs largely avoid addressing the meaning of this statutory language and thereby implicitly treat it as if it has no limiting effect on the scope of the term "policyholder dividend." *See* Plaintiffs' Brief at 19–20. The Government, by contrast, dedicates most of its trial brief to the claim that it is precisely this language that operates to exclude the present distributions from the "policyholder dividend" deduction. *See* Government's Brief at 10–26.

### 1. Is Either Distribution a "Dividend"?

■ "Dividend" is the first salient disputed term in the § 808(a) definition. Subchapter L itself provides no definition of the term "dividend" specific to that subchapter. Subchapter C, however, does provide a definition for all of subtitle A, which includes subchapter L. I.R.C. § 316(a).[8] Section 316(a) defines "dividend," in relevant part, as "any distribution of property made by a corporation to its shareholders ... out of its earnings and profits of the taxable year." *Id.*

6. Plaintiffs labor mightily to characterize the "policyholder dividend" deduction as so clearly intended by Congress to be construed broadly as to exempt it from the application of the ordinary canons of statutory construction discussed above. First, Plaintiffs cite dicta describing an earlier definition of "policyholder dividend" as "expansive." *Republic Nat'l Life Ins. Co. v. United States*, 594 F.2d 530, 532 (5th Cir.1979). There, the court was referring to the fact that the "policyholder dividend" definition was "expansive" in relation to the "classic dividend" definition, adding that "Congress intended to include more than just classic dividends" within policyholder dividends. *Id.* The fact that "policyholder dividend" is, in certain respects, broader in scope than "classic dividend" neither implies, nor even suggests, that Congress intended "policyholder dividend" to be construed broadly. Second, Plaintiffs point to the "any amount" language of § 808(b)(1) as an indication of the atypical breadth of this deduction. The "any amount" language, however, indicates only that any dollar value may be deducted; it does *not* indicate that any type of distribution may be deducted. In fact, § 808(b)(1) only describes one particular subtype of "policyholder dividend," and so should be read as subject to the general definition of "policyholder dividend" in § 808(a) that requires all "policyholder dividends" to be dividend-like. *See infra* Section II.B. Therefore, there is no warrant for excepting the "policyholder dividend" deduction from ordinary canons of statutory construction that indicate the propriety of reading deductions narrowly.

7. Section 808(a) of the Code provides:

**§ 808. Policyholder dividends deduction**
(a) **Policyholder dividend defined.**—For purposes of this part, the term "policyholder dividend" means any dividend or similar distribution to policyholders in their capacity as such.

8. Section 316(a) of the Code provides:

**§ 316. Dividend defined**
(a) **General rule.**—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
(1) out of its earnings and profits accumulated after February 28, 1913, or
(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

Section 316(b)(1), however, expressly prohibits the application of the language of § 316(a) to subchapter L and, therefore, to § 808(a). I.R.C. § 316(b)(1).[9] Still, the language of § 316(a) does not exhaustively describe all limits on the meaning of "dividend"; other sources of law also help define the scope of the term. *See, e.g., Hellmich v. Hellman*, 276 U.S. 233, 236–37, 48 S.Ct. 244, 245–46, 72 L.Ed. 544 (1928). Section 316(b)(1), then, prohibits *only* the application of the language of § 316(a) to limit the meaning of "dividend"; § 316(b)(1) does not prohibit the application of those other sources of law that also help define the scope of the term.[10] Therefore, in light of § 316(b)(1), all sources of law, except for the language of § 316(a), that help define the scope of the term "dividend" as it is used outside subchapter L also help define the scope of "dividend" as it is used within subchapter L, including § 808(a).[11]

What, then, are those residual constraints on the meaning of "dividend"? In *Hellmich v. Hellman*, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544 (1928), the Supreme Court applied two sources of law other than the language of the predecessor of § 316(a) to define "dividend." The *Hellmich* court first invoked case law reflecting the common usage of "dividend," describing it as:

the *recurrent* return upon stock paid to stock holders by a going corporation *in the*

ordinary course of business, which *does not reduce their stock holdings* and *leaves them in a position to enjoy future returns upon the same stock.*

*Id.* at 237, 48 S.Ct. at 245 (emphasis added). The Court then read the statutory provision defining affirmatively what a liquidation distribution *is* as also defining negatively what a dividend distribution *is not. Id.* Specifically, dividends are distinguishable from liquidations in that only the latter involve "a return to the stockholder of the value of his stock upon a surrender of his interest in the corporation." *Id.* at 235, 48 S.Ct. at 245.

Similarly, in *United States v. Davis*, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), the Court discussed the meaning of "dividend" in the context of another Code provision, again without reference to § 316(a). There, the Court described a "dividend" as a distribution whose "effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders." *Id.* at 313, 90 S.Ct. at 1048. The court concluded, in turn, that a distribution is "not essentially equivalent to a dividend" if it "result[s] in a meaningful reduction of the shareholder's proportionate interest in the corporation." *Id.; see Bradbury v. Commissioner*, 298 F.2d 111, 115 (1st Cir.1962) (affirming that dividends do

---

9. Section 316(b)(1) of the Code provides:

**§ 316.  Dividend defined**

.     .     .     .     .

**(b) Special rules.—**
**(1) Certain insurance company dividends.—** The definition in subsection (a) shall not apply to the term "dividend" as used in subchapter L in any case where the reference is to dividends of insurance companies paid to policyholders as such.

10. Indeed, § 316(b)(1) *cannot* prohibit the application of other sources of law that help define "dividend" without thereby reading the term (and, consequently, "or similar") entirely out of the § 808(a) definition of "policyholder dividend." To read "dividend" as limitless in scope in the phrase "any dividend or similar distribution" is to read the phrase instead as "any distribution." Although amending the statute in this way apparently is Plaintiffs' desire, it plainly is not Congress's intent. *See* Plaintiffs' Brief at 30–31;  Plaintiffs' Reply Brief at 2.

11. This reading of the relationship among § 316(a), § 316(b)(1), and § 808(a) comports well with Congress's understanding of the substantive economic content of "policyholder dividends." Congress expects "policyholder dividends" to include not only earnings and profits, but a component analogous to a return of capital. *American Mut. Life Ins. Co. v. United States*, 43 F.3d 1172, 1173 (8th Cir.1994); *see Republic Nat'l Life Ins. Co. v. United States*, 594 F.2d 530, 536 n. 21 (5th Cir.1979) (quoting legislative history). Indeed, policyholder dividends are deductible precisely because they contain that capital-like component and precisely to the extent of that component. *See* I.R.C. §§ 808(c)(2), 809. If, however, § 316(a) restrictions remained applicable to the term "dividend" in § 808(a), "policyholder dividends" would include only earnings and profits, thus excluding the targeted deductible capital-like component. Therefore, § 316(b)(1) allows the § 808(a) definition of "policyholder dividend" to include that deductible capital-like component without relaxing any other restrictions on the term "dividend."

not change shareholders' proportionate interests in the corporation).

In light of these authorities, it comes as no surprise that Plaintiffs have not produced any case, statute, regulation, or other legal authority defining the term "dividend" as a distribution to a shareholder made in exchange for a substantial reduction, not to mention a complete surrender, of the shareholder's proportional interest in the company.[12] Nor have Plaintiffs produced any such authority defining the term "dividend" as a distribution to a shareholder made in exchange for *any* form of property of equivalent value, proportional shareholder interest or otherwise.[13]

The term "dividend" in the § 808(a) definition of "policyholder dividend," then, does not include either of the distributions here at issue. Both the cash and stock distributions were made to Eligible Policyholders in exchange for the complete surrender of all their proportional interests in the former Union Mutual. Both the cash and stock distributions were made to Eligible Policyholders in exchange for property of equivalent value, namely, their Membership Interests in the former Union Mutual. Therefore, neither type of distribution may be considered a "dividend" for purposes of § 808(a).

## 2. Is Either Distribution a "Similar Distribution"?

■ Having determined that the "any dividend" language of § 808(a) does not include the present distributions, the question remains whether the "or similar distribution" language does. This language appears to broaden the meaning of "policyholder dividend" beyond the already broadened meaning of "dividend" discussed above.[14] If the "or similar distribution" language broadens "policyholder dividend" at all, however, it does so only in small measure given how narrowly both deduction provisions and subchapter L provisions should be read. *See supra* Section II.A.

The remaining question under § 808(a), then, is whether the "or similar distribution" language broadens "policyholder dividend" enough to include the distributions at issue. More precisely, the remaining question is whether Plaintiffs have met their burden to show clearly that Congress intended that a distribution that is dissimilar to a "dividend," both because it is made in exchange for complete surrender of a shareholder's proportional interest in a company and because it is made in exchange for property of equivalent value, nevertheless remains similar

---

**12.** The closest semblance of contrary legal authority Plaintiffs produce is disputed expert opinion that "termination dividends" are made to policyholders in exchange for the surrender of all their proportional interests in the insurance company. Plaintiffs' Brief at 31–32. For several reasons, this opinion does not constitute valid contrary legal authority. First, expert opinion on a matter of law bears little, if any, persuasive authority, particularly when binding authorities, such as those discussed above, militate strongly against the opinion. Second, at least one expert denies that "termination dividends" are made *in exchange for* surrendering all proportional interests in the company. Deposition of Ralph J. Sayre, January 26, 1995, at 191. Instead, he affirms only that most "termination dividends" are made *upon the occasion of* surrendering proportional interests in the company. *Id.* at 192–93. Moreover, he denies that "termination dividends" represent the economic value of those surrendered proportional interests, or that "termination dividends" are distributed to compensate for, or to induce, the surrender of those interests. *Id.* at 48, 191. Third, the term "termination dividend" is not the term "dividend," but a term of art that may or may not be defined as a

species of "dividend." (In other words, it may be defined in part as "any distribution, regardless of similarity to a dividend," just as Plaintiffs would define "policyholder dividend.") Therefore, even if "termination dividends" were distributions made in exchange for the surrender of all proportional interests in the company, that fact has no demonstrated relevance to whether "dividends" may be distributions made in exchange for the surrender of all proportional interests in the company.

**13.** In fact, in exchange transactions between a noncorporate shareholder and a corporation, property the shareholder receives from the corporation is not even taxed as a distribution except to the extent that its value exceeds the value of the property the shareholder gives to the corporation. *See* Treas.Reg. § 1.301–1(j).

**14.** The "or similar distribution" language, however, may be read not to broaden the meaning of "dividend" at all. Instead, it may simply emphasize and reinforce the more precise broadening function of § 316(b)(1): to indicate that the term "dividend" in subchapter L is not limited to earnings and profits.

enough to a "dividend" to warrant the special tax treatment of a deductible "policyholder dividend." That question must be answered in the negative.

Plaintiffs make no attempt to show that the distributions in this case are similar to a "dividend" in any way, least of all similar in such a way and to such an extent as to warrant their inclusion among those distributions Congress clearly intended for deductibility. Rather than acknowledge the limiting effects of the "any dividend or similar distribution" language of § 808(a), Plaintiffs dwell on the capital structure of mutual insurance companies, the value of symmetry in taxation, and the economic content of actual policyholder dividends.[15] *See Penn Mut. Life Ins. Co. v. Lederer,* 252 U.S. 523, 527, 40 S.Ct. 397, 398, 64 L.Ed. 698 (1920). Accordingly, Plaintiffs do not even begin to carry their burden of showing that these distributions fit within the limits of that statutory language and, therefore, within the limits of Congress's intent to allow the deduction. Neither the cash nor the stock distribution in this case, then, constitutes a deductible "policyholder dividend" because neither meets the "any dividend or similar distribution" requirement of § 808(a).

**15.** The error underlying Plaintiffs' lengthy argument, by which they ignore the letter of § 808(a) but appeal to what they consider its spirit, may be stated comparatively briefly. The fact that Congress intended life insurers to be able to deduct *any dividend-like distribution* to policyholders to the extent of its capital-like component neither implies, nor even gives rise to the inference, that Congress also intended life insurers to be able to deduct *any distribution at all* to policyholders that contains a capital-like component to the extent of that component. Contrary to Plaintiffs' contention, this Court does not consider the intention to limit the deduction only to dividend-like distributions so irrationally asymmetric and unfair that it should not be imputed to Congress. *See* Plaintiffs' Brief at 33–34; Plaintiffs' Reply Brief at 14–15. It is far from unfair for Congress to tax as income to mutual companies their capital-like funds upon receipt and then to allow a corresponding deduction for those funds upon distribution only when they are measured out in a certain form. (To be sure, Congress is free to allow no deduction at all.) Instead, limiting the deduction only to dividend-like distributions may be said to perform any number of legitimate purposes. One such purpose may be what Plaintiffs accurately identify as the purpose of certain

## C. Does the Amount of Either Distribution "Depend[ ] on the Experience of the Company or the Discretion of the Management" Under § 808(b)(1)?

Not only are the distributions in this case not "dividends or similar distributions" under § 808(a), they do not fall within any of the four subcategories of distribution specifically enumerated in § 808(b) as included among "policyholder dividends." Plaintiffs argue only that the distributions fit within the first of these categories, described in § 808(b)(1), which includes "any amount ... [that] is not fixed in the contract but depends on the experience of the company or the discretion of the management." I.R.C. § 808(b)(1).[16] This Court finds that § 808(b)(1) does not include the present distributions because, although their amounts are not fixed in the contract, their amounts do not depend on the experience of the company or the discretion of the management.

### 1. Is the Amount of Either Distribution "Fixed in the Contract"?

Plaintiffs first contend that the amounts of the distributions in this case are "not fixed in the contract." A distribution amount is "fixed in the contract" when policy

provisions of previous regimes governing the deductibility of "policyholder dividends"—simply to limit life insurers' ability to use the deduction. Plaintiffs' Brief at 6–7, 10. Another such purpose may be to ensure the application to insurance companies, stock and mutual alike, of those provisions of subchapter C applying to all other companies, stock and mutual alike, that govern the taxation of certain distributions that are not dividend-like, such as distributions constituting redemptions and exchanges. *See supra* Section II.A.; I.R.C. §§ 302(b)(3), 351(a). Notwithstanding Plaintiffs' contention, then, this Court infers the spirit of § 808(a) to be in harmony with its letter and gives effect to both.

**16.** Section 808(b)(1) of the Code provides:

**§ 808. Policyholder dividends deduction**

. . . . .

**(b) Certain amounts included.**—For purposes of this part, the term "policyholder dividend" includes—

**(1)** any amount paid or credited (including as an increase in benefits) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management

contract provisions both fix the distribution amount, such as by formula, and legally oblige the insurance company to make the distribution. *Prairie States Life Ins. Co. v. United States*, 828 F.2d 1222, 1227 (8th Cir. 1987). There are no policy contract provisions governing the distribution amounts in this case. This Court, therefore, finds that those distribution amounts are "not fixed in the contract."

Plaintiffs then argue that this Court's finding that the distribution amounts are "not fixed in the contract" suffices alone to include the distributions within § 808(b)(1), for that finding implies a corresponding finding that the distribution amounts either "depend[ ] on the experience of the company or the discretion of the management." Plaintiffs' Reply Brief at 9. In support of this argument, Plaintiffs cite *dicta* from *American National Insurance Co. v. United States*, 690 F.2d 878 (Ct.Cl.1982), suggesting that these latter two elements of the § 808(b)(1) definition "may not have independent significance" and "seem to be opposite sides of the same coin, in the sense that the inquiry is whether the amounts are either fixed in the contract or depend upon [experience or discretion]." *Id.* at 886.

This Court is not persuaded to read these latter two elements of the § 808(b)(1) definition out of the statute by needlessly denying their "independent significance." Indeed, far from being superfluous, the question of whether the amount depends on company experience or management discretion constitutes the primary inquiry under § 808(b)(1).[17] The subsidiary inquiry of whether the amount is fixed in the contract facilitates, but cannot substitute entirely for, the primary inquiry; the subsidiary inquiry serves only to exclude from the primary inquiry an easily identified category of distributions that invariably fail the primary inquiry.

In other words, if a distribution amount is "fixed in the contract," it categorically cannot "depend[ ] on the experience of the company

or the discretion of the management." If, however, a distribution amount is "*not* fixed in the contract," it may or may not "depend[ ] on the experience of the company or the discretion of the management." Only certain distributions have their amounts "fixed in the contract"; within the otherwise boundless residual category (*i.e.,* "not fixed in the contract"), only certain distributions depend on either company experience or management discretion.

The *American National* court's *dicta,* then, were appropriate to the facts before it because the distributions there were fixed in the contract. *See American Nat'l,* 690 F.2d at 886 ("Since we hold that the amounts . . . were fixed by the contract, it follows that they did not depend upon the experience of the company or the discretion of the management.") Those *dicta,* by contrast, are not appropriate to the facts before this Court because the amounts here are *not* fixed in the contract. Therefore, the questions of whether the distribution amounts depend on company experience or on management discretion remain open. This Court now turns to those questions.

## 2. Does the Amount of Either Distribution "Depend[ ] on the Experience of the Company"?

Plaintiffs claim that the amounts of both distributions "depend on the experience of the company." "Experience of the company" refers only to company-specific profit and loss experience, not industry-wide actuarial experience. *Republic Nat'l Life Ins. Co. v. United States*, 594 F.2d 530, 534–35 (5th Cir.1979). More specifically, the relevant profit and loss experience is limited to the company's "experience in the particular year for which the refunds are made, not its overall past experience and history." *American Nat'l,* 690 F.2d at 886. Here, the distribution amounts are based on Union Mutual's profit and loss experience for the entire history of the company since 1848, not for the particular year in which the distributions are

---

17. The clearest indication of the indispensability and primacy of the company-experience-or-management-discretion inquiry is Congress's use of the conjunctive "but" to introduce it. To accept

Plaintiffs' reading of that inquiry as dispensable and equivalent to the not-fixed-in-the-contract inquiry is effectively to amend that conjunctive "but" to the disjunctive "or."

made. Therefore, the distribution amounts do not depend on the "experience of the company."

### 3. Does the Amount of Either Distribution "Depend[ ] ... on the Discretion of the Management"?

Plaintiffs argue, in the alternative, that the distribution amounts in this case "depend on the discretion of the management." The term "discretion of the management" does not include the limited form of discretion that management necessarily exercises in designing any general formula for fixing distribution amounts. *American Nat'l*, 690 F.2d at 887. Here, that limited form of discretion is the only form that Union Mutual's management could even colorably have exercised. Indeed, the decisionmaking power of Union Mutual's management regarding the formula for determining Equity Shares is so thoroughly circumscribed that it can hardly be called "discretion" at all. More specifically, the design of the formula, along with the rest of the Plan, was subject both to the requirements of Maine insurance law as implemented by the Maine Superintendent of Insurance and to a supermajority vote of policyholders. *See* Plan at A–3. The distribution amounts, therefore, do not depend on the "discretion of the management." Nor, then, do the distributions fit within § 808(b)(1).

### III. CONCLUSION

Section 808 defines "policyholder dividend" as "any dividend or similar distribution to policyholders in their capacity as such," including "any amount paid or credited ... [that] is not fixed in the contract but depends on the experience of the company or the discretion of the management." I.R.C. §§ 808(a), 808(b)(1). Plaintiffs urge this Court to read that definition, in effect, as "any distribution to policyholders that is not fixed in the contract," while the Government urges that it be read as "any dividend-like distribution to policyholders that depends on company experience or management discretion, which categorically does not include those fixed in the contract." This Court finds that the Government's interpretation of "policyholder dividend" provides a more nearly comprehensive account of all relevant statutory language, and so provides a more nearly adequate account of the intention that Congress sought to embody in that language.

This Court further finds that the distributions of cash and stock in this case do not fit within the reading of "policyholder dividend" accepted by the Court. Those distributions are not "dividend-like" both because policyholders obtained them in exchange for property of equivalent value and because policyholders obtained them in exchange for the surrender of all their proportional interests in Union Mutual. Because the distribution amounts are not "fixed in the contract," the question of whether they "depend on company experience or management discretion" is not summarily answered in the negative. That question is ultimately answered in the negative, however, because the distributions do not fall within the meaning of "company experience" or "management discretion" as those terms have been interpreted. Therefore, neither the cash nor the stock distribution is deductible to Plaintiffs under § 805(a)(3).

Accordingly, it is hereby *ORDERED* that judgment herein be, and it is hereby, *ENTERED* in favor of the Defendant, United States of America, on all claims set forth in the Complaint.